# DISTRICT COURT OF THE VIRGIN ISLANDS
## DIVISION OF ST. THOMAS AND ST. JOHN

_____
                                        )
In re:                                  )
                                        )
      **JEFFREY J. PROSSER,**                    )      **Bankruptcy No. 2006-30009**
                                        )      **Chapter 7**
      **Debtor.**                               )
                                        )
_____)
                                        )
**STAN SPRINGEL, CHAPTER 11 TRUSTEE**       )
**OF THE BANKRUPTCY ESTATE OF**             )
**INNOVATIVE COMMUNICATION**                )
**CORPORATION AND JAMES P.**                )
**CARROLL, CHAPTER 7 TRUSTEE OF**           )
**THE BANKRUPTCY ESTATE OF**                )
**JEFFREY J. PROSSER,**                     )
                                        )
      **Plaintiffs/Appellees,**                 )      **Civil Action No. 3:2013-0087**
                                        )      **consolidated with**
                                        )      **Civil Action No. 3:2013-0010**
      **v.**                                    )      **Civil Action No. 3:2013-0056**
                                        )      **Civil Action No. 3:2013-0057**
**JEFFREY J. PROSSER,**                     )
                                        )
      **Defendant/Appellant.**                  )
                                        )
_____)

**Attorneys:**
**Norman A. Abood, Esq.,**
Toledo, OH
**Robert F. Craig, Esq.,**
Omaha, NE
**Lawrence H. Schoenbach, Esq.,**
New York, NY
      *For Appellant*

**Yann Geron, Esq.,**
New York, NY
**Samuel H. Israel, Esq.,**
**William H. Stassen, Esq.,**
Philadelphia, PA
**Bernard C. Pattie, Esq.,**
St. Croix, U.S.V.I.
      *For Appellees*

## **MEMORANDUM OPINION**

**Lewis, Chief Judge**

THIS MATTER comes before the Court on the consolidated appeal of five Orders entered by the Bankruptcy Division of the District Court of the Virgin Islands ("Bankruptcy Court."). The Orders were entered as a result of the conduct of Jeffrey J. Prosser ("Prosser" or "Debtor") and his wife, Dawn Prosser, in relation to what the Bankruptcy Court found was the Prossers' dissipation and destruction of a wine collection that had been adjudicated to be property of Jeffrey Prosser's Chapter 7 Bankruptcy Estate. Because the dissipation and destruction of the wine allegedly violated prior Bankruptcy Court Orders, the Chapter 7 Trustee filed a "Motion to Enforce Turnover Order, for Contempt and for Sanctions" in August 2011. (Case 2006-bk-30009, Adversary Proceeding 2007-ap-03010, Dkt. No. 756). The Bankruptcy Court held a two-day trial on February 1 and 2, 2012, and subsequently entered certain Orders that are the subject of the consolidated appeal:

- The first appeal, docketed as Case No. 2013-cv-0010, involves two separate Orders: the September 18, 2012 "Contempt Order," which held Prosser and his wife (together, the "Prossers") in contempt and jointly and severally liable for damages suffered by the Chapter 7 Trustee, James P. Carroll (the "Trustee" or "Carroll"), due to the dissipation and destruction of the wine collection; and the January 18, 2013 "Contempt Fees Order," which directed the Prossers to pay the Trustee $528,086.07, representing the fees and expenses incurred in the filing, investigation, and litigation of the Motion to Enforce Turnover Order, for Contempt and for Sanctions.

- The second appeal, docketed as Case No. 2013-cv-0057, involves the May 24, 2013 "Supplemental Sanctions Order," which directed the Prossers to pay the Chapter 7 Trustee $419,135.59—the value of the damaged and missing wines—within thirty days.

2

- The third appeal, docketed as Case No. 2013-cv-0056, involves the May 31, 2013 "Compliance Order," which permitted the Prossers to purge the contempt by paying the Contempt Fees Order in monthly installments, and where failure to do so would constitute another civil contempt subjecting them to arrest and incarceration until the contempt was purged. If there was a default, the Prossers would be required to execute deeds of title to certain real property they owned on St. Croix (the "Anna's Hope Property") to the Chapter 7 Estate, and any additional sale proceeds could be used by the Trustee to pay the balance due on the Supplemental Sanctions Order.

- The fourth appeal, docketed as Case No. 2013-cv-0087, involves the "Rule 70 Order," dated August 16, 2013 and entered August 23, 2013, which authorized the Trustee, as a result of the Prossers' default under the Compliance Order and pursuant to the court's civil contempt powers, to execute Quitclaim Deeds on behalf of the Prossers, transferring the Anna's Hope Property to the Chapter 7 Estate to satisfy the amounts due under the Contempt Fees Order and Supplemental Sanctions Order.

For the reasons discussed below, the Court finds that the record supports the findings of contempt and damages entered by the Bankruptcy Court, and will therefore affirm the September 18, 2012 Contempt Order, the January 18, 2013 Contempt Fees Order, and the May 24, 2013 Supplemental Sanctions Order.

Also for the reasons discussed below, the Court finds that the Bankruptcy Court erred in requiring the conveyance of the Anna's Hope Property to the Chapter 7 Estate and the sale of that Property to satisfy the Contempt Fees Order (the Trustee's administrative expenses), and will therefore reverse in part the Compliance Order and the Rule 70 Order to the extent that they require such conveyance and sale. The Court will order additional briefing on the issue of whether, in light of existing law—including the Supreme Court's ruling in Law v. Siegel, 134 S. Ct. 1188 (2014)—

3

the exempt Anna's Hope Property may be conveyed to the Chapter 7 Estate and sold to pay the Supplemental Sanctions Order under the authority provided by 11 U.S.C. § 105(a) as a consequence of the Prossers having been found in contempt of court.

Finally, the stay imposed in the Court's November 15, 2013 Order (13-cv-0087, Dkt. No. 29), enjoining any sale of the Anna's Hope Property, will be continued pending further Order of this Court.

## I.      BACKGROUND AND PROCEDURAL HISTORY

Jeffrey Prosser was the "owner and sole member of Innovative Communications Company, LLC, which in turn, owned Innovative Communications Corporation, a company which provided telephone, internet, and cable service to the United States Virgin Islands and other Caribbean islands." *Carroll v. Prosser (In re Prosser)*, 574 F. App'x 82, 83 (3d Cir. 2014). In July 2006, Prosser, as an individual debtor, and two companies he owned, each filed voluntary petitions for bankruptcy protection under Chapter 11 of the Bankruptcy Code. (Case Nos. 06-bk-30009, 06-bk-30007, and 06-bk-30008, respectively). Jeffrey Prosser's individual Chapter 11 case was subsequently converted to a Chapter 7 liquidation proceeding on October 3, 2007. (06-bk-30009, Dkt. No. 865). Carroll was appointed as Chapter 7 Trustee on October 31, 2007. (06-bk-30009, Dkt. No. 949).

### A. Preliminary Injunction

On December 7, 2007, the Chapter 11 Trustee, joined by the Chapter 7 Trustee, filed a "First Amended Verified Complaint to Compel Turnover of Property of the Estate and Impose a Constructive Trust and Application for Injunctive Relief, Including Temporary Restraining Order and Preliminary and Permanent Injunctions" in adversary proceeding 07-ap-3010 (the "Turnover Action") against Jeffrey Prosser, Dawn Prosser, and their children Justin Prosser, Michael J. Prosser, Sybil G. Prosser, Michelle LaBennett, and Lyndon A. Prosser (collectively,

"Defendants"). (07-ap-03010, Dkt. No. 71; A16).[1] The Trustees sought, *inter alia*, to compel the Defendants to deliver to them all personal property in Defendants' possession or control that was acquired with Innovative funds; provide an inventory and accounting of the property; and safeguard and protect that property pending its delivery to the Trustees. (*Id.*)

After an evidentiary hearing, the Bankruptcy Court entered an "Order Granting Application for Preliminary Injunction" (the "Preliminary Injunction Order"), on December 11, 2007, in which the Bankruptcy Court found that one or more of the Prossers possessed or controlled over $9,000,000 in property—including a wine collection—acquired with Innovative funds. (07-ap-03010, Dkt. No. 79; A18). The Preliminary Injunction Order directed the Defendants to provide the Trustees with "a complete and detailed inventory of all Property of which they have knowledge, possession, custody, or control" and required them to safeguard "the Property in secure locations and protect the Property from destruction, damage, modification, theft, removal, or transfer, pending its turnover to the Trustees." (*Id.*) The Order further provided that Defendants "shall not spend, consume, damage, dispose of, sequester, abscond with, secrete, or transfer the Property in any form whatsoever without prior, written approval obtained from both Trustees, pending further Order of the Court" pursuant to 11 U.S.C. § 542. (*Id.*) The Bankruptcy Court found that there was a substantial likelihood that this property, then in possession of the Prossers, was property of the Estate; that there was a substantial likelihood that the Trustees would succeed on the merits of the Turnover Action; and that not granting injunctive relief would risk irreparable injury to the Estates. (*Id.*) The wine at issue in these appeals was included in the property referred to in the Preliminary Injunction Order.

The Prossers timely filed a notice of appeal from the December 11, 2007 Preliminary

---

[1] Materials referred to with an "A" are found on the CD containing the record on appeal and exhibits 1-145. *See* 13-cv-0087, Dkt. Nos. 43, 45.

Injunction Order. (07-ap-3010, Dkt. Nos. 90, 91). On June 6, 2008, the District Court affirmed the Order. (08-cv-0016, Dkt. No. 28; A80). The Prossers appealed the District Court Order to the Third Circuit Court of Appeals, which dismissed the Prossers' appeal of the Preliminary Injunction Order on June 8, 2009 for failure to timely file a brief and appendix as directed. (08-cv-0016, Dkt. No. 32).

The Trustee was tasked with determining the scope of the assets that would be coming into the Chapter 7 Estate, including the wine collection located at two of Prosser's residences: Shoys Estate, St. Croix, U.S. Virgin Islands ("Shoys Estate") and Palm Beach, Florida. The Trustee traveled to the Prossers' Palm Beach residence on January 16, 2008 with Alan Barbee, a partner at the forensic accounting firm Marcum LLP, and employees of Christie's Fine Arts auction house. (A134 at 21-22, Transcript of Contempt Trial, Feb. 1, 2012). The Trustee described the wine room at the Palm Beach residence as self-contained and climate-controlled, with cedar-lined shelves. (*Id.* at 24). The temperature there was significantly cooler than the home. (*Id.* at 33-34). The Marcum and Christie's employees conducted an inventory by diagramming the wine room, labeling the shelf locations, and cross-referencing to insure an accurate count. (*Id.* at 26-27).

On January 25 and 26, 2008, the Chapter 7 Trustee and a Christie's employee, Melissa Bernstein, conducted a similar inventory of the wine located at the Prossers' Shoys Estate residence. (*Id.* at 27-28). Carroll testified that the wine was stored in three separate locations: (1) a climate-controlled wine refrigerator in the home; (2) a self-contained refrigerated wine storage area near the swimming pool that had temperature and humidity controls and cedar-lined shelves, which contained most of the wine; and (3) an outbuilding maintained by two functioning air conditioning wall units. (*Id.* at 30, 36). The temperature in the outbuilding was "[d]rastically different" from the hot and humid weather outside. (*Id.* at 34). The Trustee and Ms. Bernstein methodically counted the wine on a shelf-by-shelf basis. (*Id.* at 36-37). The Trustee testified that,

during that 2008 visit, most of the wine in the outbuilding was stored in its original packing crates, with the exception of a few loose bottles stacked in the corner. (*Id.* at 180).

The inventories from the Palm Beach and Shoys Estate residences, as well as from the other locations where the Prossers had stored wines, were sent to Christie's. (*Id.* at 131-32).[2] The Prossers' counsel (who had been present during the Palm Beach inventory and during one day of the Shoys Estate inventory) received a copy of the inventories from the two residences and the other wine storage locations. (*Id*. at 38, 132).

The Trustee claimed the wine as an estate asset, and asserted that Dawn Prosser had no cognizable legal interest in it. Mrs. Prosser insisted that she owned 50%, if not 100%, of the wine. (T3, ¶¶ F, G).[3] On March 20, 2008, the Bankruptcy Court ruled that Jeffrey Prosser's interest in the wine collection was property of the Estate and could not be exempted as a matter of law. (06-bk-30009, Dkt. No. 1458).

In April 2008, the Trustee filed a Complaint (the "Wine Complaint") (08-ap-03010) seeking judgment against Dawn Prosser that would allow the Trustee to sell Mrs. Prosser's alleged interest in the wine, subject to her right of first refusal pursuant to 11 U.S.C. § 363(i). (A134 at 38-39).[4] Pending resolution of the ownership issue, the Bankruptcy Court ordered the Trustee and counsel for Dawn Prosser to allocate the wine on a bottle-by-bottle basis in a 50-50 split. (*Id.* at

---

[2] The Prossers also stored wine at their residence in Lake Placid New York, at Park Avenue Liquors and Zachy's Wine and Liquor, Inc. in New York City, and at The Store Room in West Palm Beach, Florida. (A134 at 132).

[3] "T" represents the Trustee's supplement to the record on appeal, provided on the CD. (13-cv-0087, Dkt. No. 45).

[4] 11 U.S.C. § 363(i) provides that before the consummation of a sale of estate property that was community property of the debtor and the debtor's spouse immediately before the commencement of the case, the debtor's spouse could purchase the property at the price at which the sale was to be consummated.

38-40, 56; T1-33).

In response to that Order, the parties negotiated how to fairly allocate the wine. Dawn Prosser's counsel suggested that Mrs. Prosser obtain her own appraisal of the wine. Following counsel's advice, Dawn Prosser hired William Edgerton who compiled the "Edgerton Appraisal," which inventoried and gave a high and low range of the value of the bottles. (*Id*. at 41-42; T 309-354).

### A.  Stipulation, 9019 Order, and Turnover Order

In October 2008, the Trustee filed a motion to, *inter alia*, approve a Stipulation in which he and Dawn Prosser agreed on the approximate market value of the wine—between $2.15 and $2.28 million, based on the Edgerton Appraisal—and further agreed to divide the wine evenly as set forth in a Distribution Schedule attached to the Stipulation until the issue of ownership of Dawn Prosser's share of the wine could be determined. (*Id.* at 42-46, 49-51; T1-33, T355-370; 08-ap-03010, Dkt. No. 44). On December 12, 2008, the Court entered an Order (the "9019 Order") which, *inter alia*, approved the Stipulation, (Dkt. No. 44), although slightly modifying the text.[5] (08-ap-03010; Dkt. No. 61; T34-36) The Order provided: "Nothing in this Stipulation shall be deemed to constitute a modification or alteration, or in any way affect the continuing enforceability, of the Injunction as it relates to the Wines." (08-ap-03010, Dkt. No. 61; T34-36). After the Court entered the 9019 Order, the Trustee sold the wine allocated to him, and the wine allocated to Dawn Prosser remained in her possession pending resolution of the ownership issue. (A134 at 59). The Prossers did not appeal the 9019 Order.

Trial in adversary proceeding 07-ap-03010—initiated by the Amended Complaint filed by

---

[5] Rule 9019 of the Federal Rules of Bankruptcy Procedure provides that "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." Fed. R. Bankr. P. 9019(a).

the Chapter 7 and 11 Trustees to compel turnover of the Prossers' property—took place on November 17-20, 2008, December 8-10, 2008, February 10, 2009, March 10, 2009, and March 23-26, 2009, with closing arguments on July 23, 2009. (07-ap-03010, Dkt. Nos. 573, 590, 628, 637, 640, 680).

On February 9, 2011, the Bankruptcy Court entered the Turnover Order which found that the Chapter 7 Trustee had met his burden of "proving the Chapter 7 estate's interest in certain items of property currently in the possession of one or more [Prosser] Defendants such that turnover is appropriate." (07-ap-03010, Dkt. No. 728 at 4; A59). As relevant here, the Bankruptcy Court held that "there [was] no credible evidence that Dawn Prosser has any interest in the wines"; "all wines were solely Jeffrey Prosser's"; and, "[a]s such, all wines must be turned over to the Chapter 7 Trustee." (*Id.* at 72-73). The Turnover Order also made the preliminary injunction permanent and required it to remain in effect until the wine and other items were turned over "forthwith" to the Trustee. (*Id.* at 133; A134 at 56-58). In the turnover proceeding, the Prossers raised the issue that the Bankruptcy Court lacked subject matter jurisdiction because the ownership of the wine was disputed. (07-ap-03010, Dkt. No. 728 at 10). In its Turnover Memorandum Opinion, the Bankruptcy Court rejected that argument, citing numerous cases where courts had determined that "'matters requiring a declaration of whether certain property comes within the definition of property of the estate' as set forth in Bankruptcy Code § 542"—such as this case— are core proceedings over which the Bankruptcy Court has subject matter jurisdiction. *In re Prosser,* 2011 WL 576068, at *3 (Bankr. D.V.I. Feb. 9, 2011) (quoting *TouchAm Holdings, Inc.*, 401 B.R. 107, 117 (Bankr. D. Del. 2009)).

The Prossers filed a Notice of Appeal of the Turnover Order after the appeal period had expired. (07-ap-03010, Dkt. No. 731; A61). In August 2011, the District Court dismissed that appeal as untimely. (11-cv-0024, Dkt. No. 14).

The Prossers also pursued the subject matter jurisdiction argument on a parallel track. In May 2011, they filed a motion pursuant to Fed. R. Civ. P. 60(b)(4) asserting that: (1) because the Bankruptcy Court lacked jurisdiction to enter the Turnover Order as a result of the disputed ownership of the assets, its judgment was void; and (2) the statutory authority for the turnover action, 11 U.S.C. § 542, did not authorize the Bankruptcy Court to adjudicate ownership of the assets at issue. (07-ap-03010, Dkt. No. 748). On September 29, 2011, the Bankruptcy Court denied the Prossers' Rule 60(b)(4) Motion. (Dkt. No. 797).

The Prossers then appealed the denial of their Rule 60(b)(4) Motion to the District Court. (07-ap-03010, Dkt. No. 803). On March 14, 2013, the District Court affirmed the Order of the Bankruptcy Court, concluding that the Bankruptcy Court was within its statutory and constitutional limits in adjudicating the underlying turnover action and had committed no error in denying the Prossers' motion for Rule 60(b)(4) relief. (11-cv-0113, Dkt. No. 34). The Prossers filed a Notice of Appeal to the Third Circuit Court of Appeals. (11-cv-0113, Dkt. No. 36). On July 17, 2014, the Third Circuit issued an Opinion rejecting the Prossers' Rule 60(b)(4) argument that the Bankruptcy Court lacked jurisdiction over the turnover action. In that Opinion, the Third Circuit held that the Prossers

> failed to identify any alleged jurisdictional error sufficiently egregious so as to render the judgment void. It is undisputed that the Bankruptcy Court specifically addressed its subject matter jurisdiction in a Memorandum Opinion [granting the permanent injunction]. . . . This is fatal to [the Prossers'] arguments, since it has long been the rule that principles of res judicata apply to jurisdictional determinations—both subject matter and personal. . . . Because subject matter jurisdiction was litigated prior to the entry of the judgment, any further challenge on that ground could only have been made on direct appeal. . . . No appeal was taken [of the Turnover Order].[6]

---

[6] As noted earlier, the Prossers' appeal of the Turnover Order had been dismissed by the District Court as untimely. The Prossers did not appeal the District Court's ruling to the Third Circuit.

10

*In re Prosser*, 574 F. App'x at 84 (citing *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982) ("A party that has had an opportunity to litigate the question of subject-matter jurisdiction may not, however, reopen that question in a collateral attack upon an adverse judgment.")). The Third Circuit held that the Prossers could not collaterally challenge the Turnover Opinion and Order in that instance. *Id.*

### B.  Inspection of the Wine

Meanwhile, in March 2011, following entry of the Turnover Order, the Trustee visited the Prossers' Palm Beach home for the purpose of counting and collecting the wine. (A134 at 61). He was accompanied by Mr. Barbee and Theresa Licamara, a Marcum LLP accountant, who were tasked with counting the wine; Melissa Bernstein of Christie's and three members of Christie's wine department, who were tasked with evaluating, packing, and shipping the wine; and an auctioneer. (*Id.* at 61-62). The Trustee's impression was that "there was a lot less wine in the wine room than when I had originally visited in 2008." (*Id.* at 64). The Trustee asked Mr. Barbee to compare the 2008 wine inventory with the bottles he and his team inventoried during the March 2011 visit. (*Id.* at 65-66). Mr. Barbee found a "significant number of bottles"—"[a]bout 49 percent" of the bottles—were missing in 2011 compared with the number of bottles counted in 2008. (*Id.* at 66).

With regard to the wine at Shoys Estate, the Trustee instructed representatives from Christie's to pack up and ship the bottles of wine so that they could be sold. (*Id.* at 75, 76). Christie's had reserved the right to inspect the wine prior to picking it up. (*Id.* at 125, 136). In his Declaration, Charles Antin, a wine specialist and Associate Vice President at Christie's, described the condition in which he found the wine during his July 28, 2011 visit to Shoys Estate. He stated that the outbuilding storage area had two small window-sized air conditioners: one was "ineffective" and the other was unplugged. (A101 at 2). The bottles were chaotically stacked on

top of each other; the temperature in the room was almost equivalent to the ambient air outside; and the wine was warm to the touch. (*Id*. at 2-3). Since Christie's sells wine stored in temperature-controlled environments of approximately 55 to 56 degrees, Mr. Antin deemed the wine not acceptable for sale. The Prosser representative did not permit Mr. Antin to count the bottles. (*Id.*) At the contempt trial, the Trustee testified that Mr. Antin telephoned him that day, described the storage conditions, and advised him that the wine contained in the outbuilding was ruined. (A134 at 75-76, 124-25, 133-36).

### C.  Contempt Motion

In view of what he had learned from the March 2011 visit to the Prosser's Palm Beach residence and the July 2011 visit to the Shoys Estate residence, the Trustee filed a "Motion to Enforce Turnover Order, for Contempt and for Sanctions" against the Prossers on August 4, 2011. (07-ap-03010, Dkt. No. 756; A62). He asserted that, "[i]n blatant violation of several Orders of this Court, the Prossers have willfully and in bad faith dissipated and destroyed valuable assets belonging to the Chapter 7 Estate"—approximately $400,000.00 in fine wine stored at both residences. (*Id.* at 2). The Trustee alleged that the Prossers failed to keep the wine "in secure locations and protect them from destruction, damage, modification, theft, removal, or transfer pending its turnover to the Trustee[]" in violation of the Preliminary Injunction Order, the 9019 Order, and the Turnover Order. (*Id*. at 16, 18). The Trustee sought a finding of contempt against the Prossers, the imposition of sanctions in the form of all legal fees and costs associated with the Trustee's investigation of the wine and efforts to liquidate the assets dating back to 2008, as well as an order permitting the Trustee to collect the value of the missing or damaged wine from Dawn Prosser's interest in the proceeds of the sales of the Prossers' co-owned personal property. (*Id.* at 4). In response, the Prossers filed a Request for an Evidentiary Hearing. (07-ap-03010, Dkt. No. 763).

In preparation for the trial in this matter, the Trustee retained two wine experts—Mary Ewing-Mulligan and Lisa Granik—who traveled with Ms. Licamara to Shoys Estate on December 15, 2011 to inventory and evaluate the wine. (A135, Transcript of Contempt Trial, Feb. 2, 2012, at 29-30). They categorized and organized the wine by vintage, and Ms. Licamara physically counted each bottle and cross-checked the numbers in the Edgerton Appraisal with the Distribution Schedule attached to the Stipulation. (*Id.* at 30-32, 46-47, 131; T309-354; T1-T33). She observed that, in addition to the haphazard storage conditions, the room was dirty and contained a lot of junk; the labels on the bottles were damaged and some were missing; and a glass paned window on the door had been broken and glass was on the floor. (A135 at 47-52). Counsel for Dawn Prosser was present during the December 15, 2011 closing inventory. (*Id.* at 62-63).

Ms. Ewing-Mulligan submitted an expert report, dated December 29, 2011, "for the purpose of assessing the condition and value of the wine" stored at Shoys Estate, in which she offered her "conclusions regarding the overall condition of the wines and their sale-ability." (07-ap-03010, Dkt. No. 915-2; T215-40). She listed her qualifications, including a Master of Wine ("MW") credential, the "highest professional credential in the field," which requires a "far-reaching knowledge of wine from its production through to its commercialization." (*Id.*) Her report noted that she was the first woman in the United States to earn a MW title—one of thirty-one people in the United States so qualified. (*Id.*) She had been professionally involved in the wine business for nearly four decades, including through the International Wine Center in New York City, a school that she owned and operated. She had written books and articles, including the best-selling book, "Wine for Dummies" and, with her husband was a wine collector, owning a cellar of 3,000 bottles. (*Id.; see also* T241-42).

Ms. Ewing-Mulligan's expert report described the proper conditions for wine storage, including: an ideal temperature between 55 and 56 degrees Fahrenheit, which should not fluctuate

by more than a few degrees; high humidity to prevent the corks from drying out; storage in a dark place because light can bring heat and can trigger chemical changes in the wine; and storage free of extraneous vapors which can enter the bottle through the cork. (T215). She indicated that air conditioning units were not appropriate for long-term storage because they dehumidify the environment and do not maintain a consistent temperature throughout the space. (*Id.*) Ms. Ewing-Mulligan stated that several factors influence the value of wine for resale by a collector, including: the quality and reputation of the producer and the vintage; the condition of the bottle (high fill-level and proper cork placement); the condition of the label (clean and entire); and the provenance of the wine. (T216-17). She observed that the original inventory of the Prosser wine collection was an "impressive list" and the collection was "investment grade," suggesting that "it was assembled by someone with knowledge of fine wine and discerning taste." (T217).

Ms. Ewing-Mulligan's report contrasted those proper wine storage conditions with the storage conditions in which she found the St. Croix wine in December 2011. She described how the wine was stored on the ground floor of a two-story concrete building. The room had a number of windows, none of which had shades or other covering. Three of the nine panes of glass on the door were missing and covered by a board. The room had two operating window air conditioning units that cooled the air to approximately 70 degrees. (*Id.*) Ms. Ewing-Mulligan described the room as a storage facility: in addition to the wine, the room contained an old chandelier, power tools, a ladder, sports equipment, and miscellaneous household junk. (*Id.*) The bottles and crates of wine were haphazardly placed throughout the room, some covered with junk. Wine was stacked in two large non-operating wine coolers whose doors were open. The room was filthy; cockroach bait was on the floor. Some wine cases had evidence of water damage. Damage to the wine labels was "almost universal": some were moldy; some were faded, missing, or torn; some had insect feces on them and others had been literally eaten away by insects. (T217-18). She estimated that "no

14

more than 25 percent of the bottles had labels whose condition (without considering other factors) would be acceptable to a buyer." (T218).

Ms. Ewing-Mulligan observed that a number of bottles were "warm to the touch," most were at room temperature, and no bottle she touched was actually cool. (*Id.*) To determine the condition of the wine, she tasted the wine from six bottles. Those wines exhibited "varying degrees of distress," with none of them living up to the normal expectations of a knowledgeable wine lover. (T219) Every cork broke when it was being extracted from the bottles: generally, "the poor condition of a cork . . . indicates that the bottle has not been stored properly in terms of heat and humidity." (*Id.*) Her experience with these six bad corks found in six random bottles suggested to her that all of the bottles in the collection likely had damaged corks. She measured the temperature of the opened bottles with a wine thermometer. The temperatures ranged from 68 to 72 degrees, which was "far too warm." (*Id.*)

Ms. Ewing-Mulligan concluded that,

> because of the chaotic arrangement of bottles in the room it was impossible to view the wines as separate lots, some of which might be in better condition than others.... Every aspect of the storage has individually affected the wine negatively and together the storage conditions have combined to ruin the wines.

(T219-20). She cited temperature, humidity, light, cleanliness, water leakage, and handling of the bottles as contributing to the condition of the collection. She opined that "the entire collection has been destroyed by careless or willfully negligent storage." (T220-21).

Ms. Granik's expert report contained similar findings. (07-ap-03010, Dkt. No. 915-1).

On January 13, 2012, the Prossers filed a Motion *in Limine* in which they objected to the expert reports of Ms. Ewing-Mulligan and Ms. Granik, and requested a hearing pursuant to *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993). (07-ap-03010, Dkt. No. 913). The Bankruptcy Court addressed the motion at trial, where only Ms. Ewing-Mulligan was offered as

an expert. The Prossers claimed that: there was no "objective sample" from a vintner against which Ms. Ewing-Mulligan could compare the wine she tasted; taste was subjective; she could not testify as to the quality of wine inside a bottle that had not actually been opened and tasted; she was not qualified to testify about wine marketing; and there was "no scientific body of knowledge" to support her conclusions. (A135 at 107-108, 110, 114, 117). The Bankruptcy Court overruled the Prossers' objections, finding Ms. Ewing-Mulligan "qualified to express an opinion on marketability, to the quality of the wine, [and] the content and the condition of the wine storage in this particular space." (*Id*. at 121). The Bankruptcy Court found the issues raised by the Prossers went to the weight to be accorded the witness' testimony, not to her qualifications. (*Id.*)

At the trial, held on February 1 and 2, 2012, the Trustee, Teresa Licamara, and Ms. Ewing-Mulligan testified. Jeffrey and Dawn Prosser testified by deposition, as did a Prosser employee, Oakland Benta, and a few other Prosser witnesses whose testimony has not been cited in this appeal.

In support of his request for damages, the Trustee submitted a demonstrative summary which contained spreadsheets showing the numbers of bottles of wine counted in the 2008 original inventories at the Palm Beach and Shoys Estate residence, and the numbers counted in the inventories in 2011. In this regard, the spreadsheets showed that 939 bottles were counted at the Palm Beach residence in 2008, and 459 were counted in March 2011. (T379). The spreadsheets also showed that 980 bottles were counted at the Shoys Estate residence in 2008, and 527 were counted in December 2011. (T383). The spreadsheets also contained damages related to the missing and unmarketable wine. The damage summaries attached to the spreadsheets indicated that the actual damages suffered by the Estate due to the wines' dissipation and unmarketability totaled $434,875.00, comprised of $351,296.00 in damages related to the collection at the Shoys Estate residence, and $83,579.00 in damages related to the collection at the Palm Beach residence.

(T372). The Bankruptcy Court found this exhibit to be an accurate summary of the wine present during the 2008 and 2011 inventories, and of the values of the wine. (Dkt. No. 1005 at 5 n.6; A84).

### D.  The Contempt Memorandum Opinion and Order

In its Contempt Memorandum Opinion, the Bankruptcy Court reviewed the testimony and documentary evidence concerning: (1) how the initial wine inventories were completed at the Prossers' Palm Beach and Shoys Estate residences in January 2008; and (2) how the wine was allocated pursuant to the Stipulation, with the valuation of the wine based on the Edgerton Appraisal. (07-ap-3010, Dkt. No. 1005 at 3-9; A84). The Court also reviewed how the Injunction's requirements that the Prossers "keep the [wine] in secure locations and protect [the wine] from destruction, damage, modification, theft, removal, or transfer, pending [its] turnover to the [Chapter 7] Trustee[]" had been reiterated in the Court's Order approving the Stipulation between Dawn Prosser and the Chapter 7 Trustee on December 12, 2008; in the 9019 Order; and in the February 9, 2011 Turnover Opinion and Order which provided that the Injunction be made permanent and kept in place until the wine was delivered to the Trustee. (*Id.* at 3-15; A84).

The Court recounted how the trial testimony showed that, in March 2011, 471 bottles of wine from the 2008 inventory, that had been stored at the Palm Beach residence, were missing; and in December 2011, 453 bottles of wine from the 2008 inventory, that had been stored at the Shoys Estate residence, were missing. (*Id.* at 16-22, citing, *inter alia,* Deposition Testimony of Charles Antin, T141 at 55, 58-60; testimony and exhibits related to Ms. Licamara's and Ms. Ewing-Mulligan's December 2011 visit to Shoys Estate). The Court quoted Ms. Ewing-Mulligan's conclusion that the wine remaining at Shoys Estate was "in a state of deterioration from poor storage conditions"; that based on their appearance alone, 75% of the wine was not marketable; and that the six samples with broken corks led her to conclude that none of the wine located at

Shoys Estate was marketable due to insect damage, temperature, humidity, and exposure to light. (*Id.* at 22-23).[7]

Based on these facts, the Court found "that the elements necessary to find the Prossers in civil contempt of court and to sanction were established in this case"—*i.e.*, that valid court orders existed, the Defendants had knowledge of the orders, and the Defendants disobeyed the orders. (*Id.* at 24, citing *In re Davitch*, 336 B.R. 241, 251 (Bankr. W.D. Pa. 2008) (citing *Harris v. City of Phila.*, 47 F.3d 1311, 1326 (3d Cir. 1995)). With regard to the first element, the Court observed that it had entered three separate valid Orders—the Preliminary Injunction Order, the 9019 Order, and the Turnover Order—designed to protect the property of the Estate while issues concerning ownership of that property were litigated. (*Id.*). The Court found that, "since December 2007 when the Injunction was entered, the Prossers have been forbidden, by explicit Order of this court, from disposing of, consuming, damaging, or in any other way compromising the integrity of the Wines." (*Id.*) The Bankruptcy Court also cited deposition testimony wherein both Jeffrey and Dawn Prosser indicated that they understood that the Injunction was binding on them (*id.* at 3); that they understood that the Stipulation dividing the wine "did not relieve them of any of the responsibilities set forth in the Injunction" (*id.* at 15); and that the Turnover Order "did not change the terms of the Injunction previously entered by the court in relation to the Wines." (*Id.; see* T80-82, T96-97, T181-83). The Court further found that although the Prossers had knowledge of those Orders, they

> flagrantly disobeyed them by dissipating (or permitting the dissipation of) approximately 52% of the inventoried 905 bottles of Wine at the Palm Beach Property, dissipating (or permitting the dissipation of) approximately 46% of the inventoried 980 bottles of Wine at the Shoys Estate, and by failing to maintain (or to make reasonable efforts to maintain) the remaining Wines at the Shoys Estate in

---

[7] The Bankruptcy Court rejected a number of the Prossers' evidentiary arguments raised at trial. For example, the Prossers disputed the number of wines in the 2008 inventory on the ground that they did not conduct their own inventory. The Court ruled that, since the wine was in their possession, they had every opportunity to count the bottles or challenge the inventories, but they had raised no objection. (07-ap-03010, Dkt. No. 1005 at 9-10; A84).

a protected, light and temperature controlled environment (as they were stored in 2008) such that they became unmarketable by Christie's. Thus, we find Jeffrey Prosser and Dawn Prosser in civil contempt of court.

(*Id.* at 24-25).

Because the Prossers' violation of the Orders was "so egregious," the Court held that sanctions were warranted. (*Id.* at 25). It adopted the values of the wine provided by Dawn Prosser's expert, Mr. Edgerton. (*Id.* at 25-26). The Court held that the Estate suffered damages

in the amount of the value of the missing and unmarketable Wines plus the fees and cost of litigation, including the Chapter 7 Estate's retention of experts. Regarding the value of the Wines, the Prossers presented no credible evidence rebutting the Chapter 7 Trustee's calculation of damages.

(*Id.* at 25). The Court held that, at the Palm Beach property, 471 bottles of wine, valued at $83,579.00, were missing in March 2011; at the Shoys Estate property, 453 bottles of wine, valued at $139,412.00, were missing in December 2011 and an additional 527 bottles of wine worth $211,884.00 were considered unmarketable, bringing the total amount of damages to $434,875.00. (*Id.* at 26). The Court awarded those damages as a sanction against the Prossers, jointly and severally, plus "an as yet undetermined amount in fees and costs, for Trustee's counsel and experts," less any net proceeds that would be recovered from an auction of the wine from Shoys Estate. (*Id.*; *see* 07-ap-03010, Dkt. No. 1005 at 25 n.32; A84).

While the Contempt Memorandum Opinion cited the damages figures above, the Contempt Order accompanying the Memorandum Opinion refrained from awarding damages. It provided that while the Prossers were liable for all damages awarded pursuant to the Memorandum Opinion, those damages could not be determined until further information was provided, and would be addressed in a supplement following review of the Trustee's fee application and the report following sale of the wine. (07-ap-03010, Dkt. No. 1006; A85).

The Prossers appealed the September 18, 2012 Contempt Order and the January 18, 2013

Contempt Fees Order (discussed below) together. (13-cv-0010, Dkt. No. 1; A91).

### E.  Contempt Fees Order and Supplemental Sanctions Order

In November 2012, the Trustee filed an "Application . . . for an Award of Fees and Expenses Incurred in Connection with the Filing, Investigation, and Litigation of the Chapter 7 Trustee's Motion to Enforce Turnover Order, for Contempt and for Sanctions." (07-ap-03010, Dkt. No. 1009). The Court held a hearing on the Application on December 12, 2012. (07-ap-03010, Dkt. No. 1020; A88). On December 18, 2012, the Court overruled the Prossers' objections, finding that they had not met their burden of showing the fees and expenses were unwarranted; that they had not specifically identified anything in the application that they found to be objectionable; that they had aggressively litigated the contempt proceeding and were "at least equally responsible for the fees and expenses incurred by the Trustee"; and that the Trustee achieved full success with the contempt motion, and thus his fees and expenses should not be reduced based on the Prossers' assertion that the Trustee achieved only limited success. (07-ap-03010, Dkt. No. 1016; A87). The Court granted the application in part and required certain minor reductions. (*Id.*)

The Trustee filed an "Amended and Supplemental Application" for an Award of Fees and Expenses (A89; 07-ap-03010, Dkt. No. 1021) and, on January 18, 2013, the Court entered the "Order Approving Amended & Supplemental Application of Chapter 7 Trustee for an Award of Fees and Expenses" ("Contempt Fees Order") which granted the Supplemental Fee Application and directed the Prossers to pay the Chapter 7 Trustee fees and costs totaling $528,086.07 within thirty days of entry of the Order. (07-ap-03010, Dkt. No. 1023; A90). As noted above, the Prossers appealed the Contempt Fees Order. (13-cv-0010, Dkt. No. 1).

Also on January 18, 2013, the Court granted the Trustee's Motion seeking an Order Approving the Sale of Wines at Auction (the "Wines Sale Order"), which permitted sale of the damaged wine on an "as is" and "where is" basis. (06-bk-30009, Dkt. Nos. 4052, 4070). The

Trustee subsequently filed a Report of Sale, Supplemental Report of Sale, and Second Supplemental Report of Sale (06-bk-30009, Dkt. Nos. 4171, 4183, 4188), reflecting that the sale of the damaged wine resulted in $15,739.41 in net proceeds to the Estate, which in turn reduced the Prossers' contempt damages to $419,135.59. (06-bk-30009, Dkt. No. 4188). The Court entered a Supplemental Order (the "Supplemental Sanctions Order") on May 24, 2013, which directed the Prossers to pay the Trustee $419,135.59—reflecting the net damages to the Chapter 7 Estate— within thirty days of entry of the Order. (07-ap-03010, Dkt. No. 1078; A142). The Prossers appealed the Supplemental Sanctions Order on June 6, 2013. (Dkt. No. 2013-cv-0057, Dkt. No. 1).

### F.  Compliance Order and Rule 70 Order

When the Prossers failed to pay the Trustee the amount due under the January 18, 2013 Contempt Fees Order, the Trustee filed a Motion seeking an Order against the Prossers to coerce their compliance with that Order. (07-ap-03010, Dkt. No. 1066; A121). The Trustee asserted that the Prossers' violation of the Court's Contempt Fees Order constituted additional contemptuous conduct warranting sanctions. (*Id.*) He argued that the three elements of contempt were once again met and the only issue was to determine whether the Prossers had the ability to comply with the Contempt Fees Order. The Trustee claimed that while the Prossers would likely argue that they did not have the funds to pay the amount awarded, they

> clearly own assets worth hundreds of thousands of dollars. As the Court is aware, the Prossers own as tenants by the entireties Anna's Hope, which the Debtor valued at $400,000 on his bankruptcy schedules. There is nothing preventing the Prossers from looking to those assets to comply with the Contempt Fee[s] Order.

(*Id.*) The Trustee noted that courts have great discretion in imposing a wide range of sanctions to coerce compliance with its orders, including incarceration. (*Id.*)

On May 31, 2013, the Court entered an "Order Coercing the Prossers' Compliance with

the January 18, 2013 Contempt Order Requiring Payment to the Trustee of Fees and Expenses Incurred in Connection with the Filing, Investigation, and Litigation of the Motion to Enforce Turnover, for Contempt, and for Sanctions" (the "Compliance Order"). (07-ap-03010, Dkt. No. 1088; A126). The Compliance Order stated that the Prossers had not complied with the Contempt Fees Order to pay $528,086.07 representing the fees and expenses incurred by the Trustee, but that they could purge their contempt of the Contempt Fees Order by paying the amount due on that Order to the Trustee in accordance with certain terms: the Prossers were required to pay the Trustee $528,086.07 in monthly installments of $8,801.44 beginning July 1, 2013 for sixty consecutive months. (*Id.*) The Compliance Order also described what would constitute a payment default by the Prossers; how the Trustee would provide them notice of the default; and the time frame within which they would have to cure. (*Id.*) If, however, the Prossers failed to cure the default, they were required, without the need for further order of the Court, to execute deeds of title conveying ownership of Plots 168, 169, 170 and 171 of Estate Shoys—the "Anna's Hope Property"—to the Chapter 7 Estate. (*Id.*) If the Prossers failed to comply with those terms, such failure "shall be punishable as a civil contempt of this Court and shall subject the Prossers to arrest and incarceration until such civil contempt is purged." (*Id.*) In addition, the Compliance Order provided that, upon conveyance of the Anna's Hope Property to the Trustee, the property would be administered as an estate asset "solely for the purpose of satisfying the amount due" on the Contempt Fees Order which would allow the Trustee to sell the property. (*Id.*) The Trustee would also have the option, following sale, of applying any net proceeds exceeding the amount due on the Contempt Fees Order against the balance due on the Supplemental Sanctions Order. (*Id.*)

The Prossers failed to make the first monthly payment on July 1, 2013, and failed to cure following notice of default served by the Trustee. They also failed to convey title to the Anna's Hope Property within the time provided by the terms of the Compliance Order. As a result, the

Trustee file a Motion pursuant to Fed. R. Civ. P. 70 to coerce compliance with the May 31, 2013

Compliance Order (the "Rule 70 Motion"). (07-ap-03010, Dkt. No. 1113; A128).[8] The Trustee

asked the Bankruptcy Court to either:

> (1) enter a judgment divesting the Prossers' title to the Anna's Hope Property and
> vesting it in the Trustee, pursuant to Rule 70(b); (2) in the alternative, converting
> the Compliance Order to a judgment and permitting the Trustee to execute deeds
> of title to the Anna's Hope Property to himself on behalf of the Prossers, pursuant
> to Rule 70(a); or (3) in the alternative, incarcerating the Prossers until such time as
> they execute deeds of title to the Anna's Hope Property to the Trustee.

(*Id.*) The Court granted the Rule 70 Motion, entered on August 23, 2013 (the "Rule 70 Order"), in

which it authorized the Trustee to execute three quitclaim deeds

> on behalf of Jeffrey and Dawn Prosser, transferring the Anna's Hope Property to
> the Chapter 7 estate, and to cause the docketing of such Deeds with the Recorder
> of Deeds in the U.S. Virgin Islands. . .  and to execute any and all other documents
> necessary and consistent with the transfer and recording of real property by a
> grantor in the U.S. Virgin Islands[.]

(07-ap-03010, Dkt. No. 1133 at 3; A131). The Rule 70 Order further provided that the Trustee's

actions were authorized pursuant to the Court's civil contempt powers, the Contempt Order, the

Compliance Order, and the Court's Supplemental Sanctions Order—the findings of which the

Court incorporated by reference. (*Id.*) The Rule 70 Order permitted the Trustee to sell the Anna's

Hope Property for the purpose of satisfying the amounts due on the Contempt Fees Order and any

additional amounts due on the Supplemental Sanctions Order, following the procedure set forth in

---

[8] Fed. R. Civ. P. 70 is applicable in adversary proceedings pursuant to Rule 7070 of the Federal
Rules of Bankruptcy Procedure. Rule 70 provides, in pertinent part:

> (a) If a judgment requires a party to convey land, to deliver a deed or other document,
> or to perform any other specific act and the party fails to comply within the time
> specified, the court may order the act to be done—at the disobedient party's
> expense—by another person appointed by the court. When done, the act has the
> same effect as if done by the party.
>
> (b) If the real or personal property is within the district, the court—instead of ordering
> a conveyance—may enter a judgment divesting any party's title and vesting it in
> others. That judgment has the effect of a legally executed conveyance.

Fed. R. Civ. P. 70(a), (b).

the Compliance Order. (*Id.* at 3-4).

The Rule 70 Order was automatically stayed for fourteen days pursuant to Fed. R. Bankr. P. 7062. On September 9, 2013, after the automatic stay had expired, the Trustee executed the Quitclaim Deeds for the Anna's Hope Property. (13-cv-0010, Dkt. No. 17-4).

### G. The Appeals

On February 1, 2013, Jeffrey Prosser filed an appeal from the Contempt Order, dated September 18, 2012 (07-ap-03010, Dkt. No. 1005), and the Contempt Fees Order, dated January 18, 2013. (07-ap-03010, Dkt. No. 1023; A127). The case was docketed in the District Court as case number 13-cv-0010.

On June 5, 2013, the Prossers filed an appeal from the Compliance Order, dated May 31, 2013. (07-ap-03010, Dkt. No. 1088). The case was docketed in the District Court as case number 13-cv-0056.

On June 6, 2013, the Prossers filed an appeal from the Supplemental Sanctions Order, dated May 24, 2013. (07-ap-03010, Dkt. No. 1078). The case was docketed in the District Court as case number 13-cv-0057.

On September 6, 2013, the Prossers filed an appeal from the Rule 70 Order, entered August 23, 2013. (07-ap-03010, Dkt. No. 1133; A132). The case was docketed in the District Court as case number 13-cv-0087.

As noted above, all of the appeals were consolidated with Case No. 13-cv-0087. (Dkt. No. 17).

### H. The Stay

On November 13, 2013, the District Court granted the Prossers' Motion to Stay the sale of the Anna's Hope Property pending appeal, finding that a realtor's pricing recommendation valuing the Property at $2,185,000 could serve as the Prossers' supersedeas bond. (13-cv-0087, Dkt. No.

29 at 9-10).

## II.      STANDARD OF REVIEW

The Prossers have raised an argument challenging the Bankruptcy Court's jurisdiction to enter the Injunction Order, the Turnover Order, and the 9019 Order. "'[I]t is familiar law that a federal court always has jurisdiction to determine its own jurisdiction.'" *White-Squire v. U.S. Postal Service*, 592 F.3d 453, 456 (3d Cir. 2010) (quoting *United States v. Ruiz*, 536 U.S. 622, 628 (2002)); *VeraSun Energy Corp. v. West Plains Co.* (*In re VeraSun Energy Corp.*), 2013 WL 3336870, at *2 (D. Del. June 28, 2013) (citing 28 U.S.C. §§ 157(a) and 1334(b)); *Chicot Cnty. Drainage Dist. v. Baxter State Bank*, 308 U.S. 371, 376-77 (1940).

The District Court of the Virgin Islands has jurisdiction to review the Orders of its Bankruptcy Division pursuant to 28 U.S.C. § 158(a). When a district court sits as an appellate court in a bankruptcy matter, it reviews the bankruptcy court's legal determinations *de novo*, its factual findings for clear error, and its exercise of discretion for abuse thereof. *See Official Comm. of Unsecured Creditors v. CIT Group/Business Credit Inc. (In re Jevic Holding Corp.)*, 787 F.3d 173, 179 (3d Cir. 2015). "A factual finding is clearly erroneous when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Schlumberger Res. Mgmt. Servs., Inc. v. CellNet Daga Sys., Inc. (In re CellNet Data Sys., Inc.)*, 327 F.3d 242, 244 (3d Cir. 2003) (internal quotation marks omitted). To demonstrate an abuse of discretion, the appellant "must show that the [Bankruptcy Court] based 'its opinion on a clearly erroneous finding of fact, an erroneous legal conclusion, or an improper application of law to fact.'" *Magistrini v. One Hour Martinizing Dry Cleaning,* 68 F. App'x 356, 357 (3d Cir. 2003) (quoting *LaSalle Nat'l Bank v. First Conn. Holding Group, LLC XXIII*, 287 F.3d 279, 288 (3d Cir. 2002)).

When reviewing a bankruptcy court's decision on a motion for contempt, the district court

applies an abuse of discretion standard. *Bayer Business & Tech. Servs. v. AGR Premier Consulting, Inc. (In re AGR Premier Consulting, Inc.)*, 550 F. App'x 115, 121 n.6 (3d Cir. 2014). When reviewing a bankruptcy court's decision to exclude or admit testimony under *Daubert v. Merrell Dow Pharms. Inc.,* 509 U.S. 579 (1993), the district court also applies an abuse of discretion standard. *Magistrini,* 68 F. App'x at 357.

### III.   DISCUSSION

#### A. The Parties' Arguments

In their brief on appeal, the Prossers raise thirteen arguments, several of which are overlapping. (Dkt. No. 48 at 2-4).[9] Item 1 challenges the Bankruptcy Court's jurisdiction to enter the 2007 Preliminary Injunction Order. (*Id.* at 2). The remaining arguments claim that the Bankruptcy Court "erred as a matter of law and abused its discretion" in making various findings and imposing certain obligations on the Prossers, including finding them in contempt; assessing damages, attorney's fees, and expenses against them; and ordering the transfer of the Anna's Hope Property to the Chapter 7 Estate. (*Id.* at 3-4).

The Trustee counters that the Prossers may not collaterally attack the valid Injunction Order, Turnover Order, and 9019 Order; the record amply supports the finding of contempt, the award of damages to the estate for the dissipated and damaged property, and the award of fees and expenses to the Trustee; and the Bankruptcy Court properly ordered the transfer of the Anna's Hope Property. (Dkt. No. 49 at 3-5).

The Court will address the Prossers' arguments seriatim.

---

[9] The Court has summarized the titles of these arguments. They are referred to in this Memorandum Opinion as Item Nos. 1-13.

### 1. Subject Matter Jurisdiction

The Prossers first focus on the Court's December 11, 2007 Order in which the Bankruptcy Court granted the Chapter 7 and 11 Trustees' Motion for a Preliminary Injunction. They argue that, because the ownership of certain property—in this case, the wine—was in dispute, the Bankruptcy Court had no subject matter jurisdiction under the turnover statute, 11 U.S.C. § 542, to enter the preliminary injunction and, without subject matter jurisdiction, the Preliminary Injunction Order was not valid. In support of their argument, the Prossers cite a number of cases for the proposition that "a trustee cannot use turnover to demand assets whose title is in dispute"; they note that it is undisputed that the property's ownership was at issue; they conclusorily assert that the Court had no subject matter jurisdiction under § 542 to grant the preliminary injunction; and they conclude that, as a result, the Court should have dismissed the case. (Dkt. No. 48 at 34-36, citing *D.E. Frey Group, Inc. v. FAS Holdings, Inc. (In re D.E. Frey Group, Inc.)*, 2006 WL 2612206, 2006 Bankr. LEXIS 233 (Bankr. D. Colo. Feb. 1, 2006), *rev'd on appeal* 387 B.R. 799 (D. Colo. 2008)).[10]

The Trustee proffers numerous arguments countering the Prossers' assertion that the Bankruptcy Court lacked subject matter jurisdiction to issue the Preliminary Injunction Order. He contends that: the Prossers have already appealed the Turnover Order (which also made the

---

[10] *Frey,* which involved a state law contract claim raised in bankruptcy court, does not support the Prossers' contention. By counterclaim, the debtor sought turnover of disputed amounts it claimed were due under a contract. The bankruptcy court opined: "Section 542 turnover proceedings are not an appropriate procedure to liquidate contract disputes. [Debtor] fails to state a claim for which a turnover order could properly enter," and granted the creditor's motion to dismiss the debtor's counterclaim. *Frey*, 2006 WL 2612206, at *5. Other than referring to "subject matter jurisdiction" in passing, the Prossers do not explain, either factually or legally, how *Frey* supports their assertion that subject matter jurisdiction was lacking over the Preliminary Injunction Order—particularly since the instant case does not involve a state law contract claim. Nor do they explain how a dispute about ownership of property in a turnover proceeding somehow robs the Bankruptcy Court of jurisdiction to adjudicate that issue.

preliminary injunction permanent), and that untimely appeal was dismissed; under the merger rule, the preliminary injunction merged with the permanent injunction, and their untimely appeal of the Turnover Order bars their appeal now; the Turnover Order is not part of the current appeal, and the Prossers have not provided the Court with a record of the proceedings underlying that Order; the merits of the underlying Turnover Order may not be called into question in a post-judgment civil contempt proceeding; the Prossers' cited cases are inapposite; and the Bankruptcy Court litigated the jurisdictional issue prior to entry of judgment and therefore any collateral challenge is prohibited. (Dkt. No. 49 at 36-40).

Many of the Trustee's arguments provide grounds for the Court to reject the Prossers' jurisdictional challenge. While a party may raise an objection to subject matter jurisdiction at any stage of the litigation, *Group Against Smog & Pollution, Inc. v. Shenango Inc.*, 810 F.3d 116, 122 n.6 (3d Cir. 2016), the introduction of the same subject matter jurisdiction argument here that was already analyzed and rejected by the Bankruptcy Court twice, as well as by the District Court and the Third Circuit on appeal, is particularly inapt and is precluded by the law of the case doctrine.

As noted above, the Prossers raised the same argument—that subject matter jurisdiction was lacking because the ownership of the wine was disputed—before the Bankruptcy Court, which rejected that claim in the Turnover Order. *In re Prosser*, 2011 WL 576068, at *3. Their appeal of the Turnover Order to the District Court was dismissed as untimely. (11-cv-0024, Dkt. No. 14). Undeterred, the Prossers once again raised the same argument in the Bankruptcy Court, in the guise of a collateral Rule 60(b)(4) motion, which that court denied. (07-ap-03010, Dkt. No. 797). The Prossers appealed the denial of the Rule 60(b)(4) motion to the District Court, which affirmed the Bankruptcy Court. (11-cv-0113, Dkt. No. 34). The Prossers then appealed to the Third Circuit Court of Appeals, which affirmed the Bankruptcy Court's Turnover Order and rejected the Prossers' jurisdictional argument. *In re Prosser*, 574 F. App'x at 84. As set forth above, the Third

Circuit addressed the jurisdictional issue at length, noting that because the Bankruptcy Court had specifically addressed subject matter jurisdiction in its Memorandum Opinion, res judicata applied to that determination, and any further challenge could only have been made on direct appeal—not by collateral attack—and no such appeal was taken here. *Id.*

The Court finds that this same subject matter jurisdiction argument raised again in the instant appeal is barred by the law of the case doctrine, which provides that "a court should not re-examine an issue already decided in the same case." *Bridge v. U.S. Parole Comm'n*, 981 F.2d 97, 103 (3d Cir. 1992). "[L]aw of the case is concerned with the extent to which law applied in a decision at one stage of litigation becomes the governing principle in later stages of the same litigation." *Rezzonico v. H & R Block, Inc.*, 182 F.3d 144, 148 (2d Cir. 1999). Without the "law of the case" doctrine, "there would be no end to a suit [because] every obstinate litigant could, by repeated appeals, compel a court to listen to criticisms on their opinions[.]" *Roberts v. Cooper*, 61 U.S. 467, 481 (1857). The law of the case doctrine applies—as here—to subject matter jurisdiction arguments. *See United States v. Local 560 (I.B.T.)*, 974 F.2d 315, 330 n.8 (3d Cir. 1992) (finding that court was bound by law of the case doctrine with regard to subject matter jurisdiction because the precise arguments were raised and considered in an earlier appeal); Charles Alan Wright, Arthur R. Miller, et al., 18B Fed. Prac. & Proc. Juris. § 4478.5 (2d ed.) ("Although a federal court is always responsible for assuring itself that it is acting within the limits of subject-matter jurisdiction statutes and Article III, this duty need not extend to perpetual reconsideration. A court may accept its own earlier determination supporting subject-matter jurisdiction[.]").

Commonly recognized exceptions to the law of the case doctrine permit reconsideration of an issue previously resolved in the same case, in "certain extraordinary circumstances," *United States v. Rush*, 645 F. App'x 166, 168 (3d Cir. 2016), if: "'(1) new evidence is available; (2) a supervening new law has been announced; or (3) the earlier decision was clearly erroneous and

would create manifest injustice."' *Roberts v. Ferman*, 826 F.3d 117, 126 (3d Cir. 2016) (quoting *Pub. Interest Research Group of N.J., Inc. v. Magnesium Elektron, Inc.*, 123 F.3d 111, 117 (3d Cir. 1997)).

This appeal does not suggest any extraordinary circumstances and none of the exceptions to the law of the case doctrine are either argued or apparent from the few facts set forth by the Prossers. Instead, the Prossers seek once again to raise, via a circuitous route, their subject matter jurisdiction argument that was initially addressed by the Bankruptcy Court on the merits, *In re Prosser*, 2011 WL 576068, at *3, and dismissed as a result of an untimely appeal by this Court. (11-cv-0024, Dkt. No. 14). The same argument was subsequently raised in a Rule 60(b)(4) Motion and again denied by the Bankruptcy Court (07-ap-03010, Dkt. No. 797); rejected on the merits by this Court (11-cv-0113, Dkt. No. 34); and rejected as an improper collateral attack by the Third Circuit. *In re Prosser*, 574 F. App'x at 84. The Court finds the law of the case doctrine applies to bar the Prossers' jurisdictional argument contained in Item 1.

## 2. Civil Contempt

The Prossers next challenge the Bankruptcy Court's September 18, 2012 Contempt Memorandum Opinion and Order, claiming that the Bankruptcy Court erred as a matter of law and abused its discretion in finding that the Trustee proved the elements of civil contempt by clear and convincing evidence, to wit: the existence of a valid Court Order; that Mr. and Mrs. Prosser had knowledge of the Order; and that the Prossers disobeyed it. The Prossers claim that: (1) the Preliminary Injunction Order was not valid because the Bankruptcy Court had no subject matter jurisdiction to enter it; (2) "while it is not disputed that the Prossers were aware of the existence of the Preliminary Injunction," they were unaware of the standards regarding preservation of the wine (relative to temperature, humidity and light) to which they would be accountable; and (3)

because those standards were missing from the Preliminary Injunction Order, it was, therefore, impermissibly vague, and they cannot be found to have disobeyed it. (Dkt. No. 48 at 37-40).

The Trustee responds that the Prossers cannot credibly claim that they did not understand the three Orders, as they were clear and unambiguous. Even if there was some ambiguity, the Trustee asserts that they would not be immune from civil contempt, as they were responsible for seeking clarification if they had any questions concerning what the Orders required. (Dkt. No. 49 at 43-46).

The Third Circuit has found that 11 U.S.C. § 105 "provides bankruptcy courts with a contempt remedy." *Simon v. FIA Card Servs., N.A.*, 732 F.3d 259, 279 (3d Cir. 2013) (citing *In re Joubert*, 411 F.3d 452, 455 (3d Cir. 2005) and *Bessette v. Avco Fin. Servs., Inc.*, 230 F.3d 439, 445 (1st Cir. 2000) ("[Section] 105 provides a bankruptcy court with statutory contempt powers, in addition to whatever inherent contempt powers the court may have. Those contempt powers inherently include the ability to sanction a party.") (citations omitted)).[11] "'Proof of contempt requires a movant to demonstrate (1) that a valid order of the court existed; (2) that the defendants had knowledge of the order; and (3) that the defendants disobeyed the order.'" *In re AGR Premier Consulting, Inc.*, 550 F. App'x at 122 (quoting *FTC v. Lane Labs-USA, Inc.,* 624 F.3d 575, 582 (3d Cir. 2010)). "Each element must be proven by clear and convincing evidence, with ambiguities resolved in favor of the party charged with contempt." *Id.* at 122-23. Further, "[a]lthough courts should hesitate to adjudge a defendant in contempt when there is ground to doubt the wrongfulness of the conduct, an alleged contemnor's behavior need not be willful in order to contravene the

---

[11] Section 105(a) provides: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process." 11 U.S.C. § 105(a).

applicable decree. In other words, good faith is not a defense to civil contempt." *Id*. at 123 (internal

quotation marks omitted). An appellate court reviews the imposition of contempt under an abuse

of discretion standard; the finding will be disturbed only if there is an error of law or a clearly

erroneous finding of fact. *Harris*, 47 F.3d at 1321. An appellate court also reviews "the sanction

imposed for civil contempt for abuse of discretion." *Id.*

In *Harris*, the Third Circuit emphasized that a person at risk for contempt has to have

proper notice of "the norm to which they must pattern their conduct." *Id.* at 1349.

> 'In order to cite a person for contempt for violating a court order, two principles,
> each a corollary of the other, must, among other requirements, be established. The
> first of these is that it must be proved that the alleged contemnor had knowledge of
> the order which he is said to have violated. The corollary of this proposition is that
> the order which is said to have been violated must be specific and definite.'

*Id.* at 1350 (quoting *Eavenson, Auchmuty & Greenwald v. Holtzman*, 775 F.2d 535, 544 (3d Cir.

1985)). In this latter regard, "'[a]n order may be so vague or indefinite that, even though the alleged

contemnor is chargeable with knowledge of such order, he cannot be punished for doing what he

did in view of lack of certainty as to what it prohibited or directed.'" *Id.* (quoting *Holtzman*, 775

F.2d at 544).

Here, with regard to the first element of civil contempt—that a valid court order existed—

the Prossers claim that the Bankruptcy Court erred as a matter of law in its finding on this element

because the Bankruptcy Court lacked subject matter jurisdiction to enter the Preliminary Injunction

Order. Accordingly, the Prossers maintain that the Preliminary Injunction Order was not a valid

Order, and the first contempt element was not met.[12] The Court rejected the subject matter

---

[12] The Bankruptcy Court found that the Prossers disobeyed three valid Orders: the Preliminary
Injunction Order, the 9019 Order, and the Turnover Order. The Prossers do not contend that the
latter two Orders were not valid. In fact, the Prossers do not challenge the entry of contempt based
on the 9019 and Turnover Orders.

jurisdiction argument above, and therefore rejects the same argument in the contempt context.

With regard to the second element of civil contempt—that the defendants had knowledge of the Order—the Prossers acknowledge on appeal, as they must, that they were "aware of the existence of the Preliminary Injunction." (Dkt. No. 48 at 37). However, they claim that they were "not aware of the standards to which they would be held accountable with regard to preservation of the Wines"—which they equate to "the storage requirements required by Christie's for marketing of Wine." (*Id.,* citing Contempt Memorandum Opinion at 25-26).[13] As a result, because the Order was not "specific and definite," they did not have the requisite "knowledge of the order" to satisfy this element of civil contempt. (*Id.* at 36, 37).

The Bankruptcy Court rejected this argument. While recognizing that the Orders

> did not specifically inform the Prossers that Christie's required wines to be stored at a certain temperature, the Prossers were specifically required to keep the Wines in the same condition as and from the time the orders were entered. They did not do so. We also find that the Debtor, as the purchaser and owner of a large collection of fine wines, had a general understanding of the proper storage methods for such a collection. This conclusion is evidenced by the methods of storage used by the Prossers for the rest of their collection in other locations, as well as the method of storing Wines at the Shoys Estate as observed in 2008.

(07-ap-03010, Dkt. No. 1005 at 18 n.23; A84). The Prossers do not articulate on appeal how the Bankruptcy Court erred as a matter of fact or law in so concluding.

The Court finds that the Bankruptcy Court did not abuse its discretion in ruling that the

---

[13] Once again, the relevant section of the Contempt Memorandum Opinion provides in part that:

> the Prossers had knowledge of the orders and flagrantly disobeyed them by dissipating (or permitting the dissipation of) approximately 52% of the inventoried 905 bottles of Wine at the Palm Beach Property, dissipating (or permitting the dissipation of) approximately 46% of the inventoried 980 bottles of Wine at the Shoys Estate, and by failing to maintain (or to make reasonable efforts to maintain) the remaining Wines at the Shoys Estate in a protected, light and temperature controlled environment (as they were stored in 2008) such that they became unmarketable by Christie's.

(07-ap-03010, Dkt. No. 1005 at 24-25; A84).

Prossers had knowledge of the Orders. As the Bankruptcy Court noted, the factual record belies the Prossers' argument. In the 2008 Stipulation, the Trustee and Dawn Prosser agreed that the approximate market value for the wine collection was between $2.15 and $2.28 million. (T31-33). At that time, the Prossers stored their valuable wine collection—described by Ms. Ewing-Mulligan as "investment grade" and "assembled by someone with knowledge of fine wine and discerning taste" (07-ap-03010, Dkt. No. 915-2 at 3; T217)—in a climate-controlled wine room with cedar lined shelves at the Palm Beach residence. (A134, at 23, 33-34). Similarly, at the Shoys Estate residence, the wine collection was stored in (1) a climate controlled wine refrigerator; (2) a self-contained refrigerated wine storage location that had temperature and humidity controls and cedar-lined shelves; and (3) an outbuilding maintained by two functioning air conditioning units. (*Id.* at 29-30, 34-36). This evidence indicates that the Prossers were well aware of how to store valuable collector-grade wine and how to insure that they maintained their value—*i.e.*, that they were not damaged or destroyed. The Bankruptcy Court did not err in so concluding.

The Third Circuit has opined that the "language of an injunction must be read in the light of the circumstances surrounding its entry: the relief sought by the moving party, the evidence produced at the hearing on the injunction, and the mischief that the injunction seeks to prevent." *United States v. Christie Indus., Inc.*, 465 F.2d 1002, 1007 (3d Cir. 1972). Here, the Trustee simply sought to keep the wine in the Prossers' possession from being damaged or dissipated while the issue of ownership was litigated—in other words, to maintain the 2008 storage conditions status quo. The evidence at the contempt trial showed that this goal was not achieved. The mischief sought to be prevented was the very dissipation and destruction of the wine that in fact occurred.

While the Prossers claim that they did not know what was required of them, their own argument belies this assertion. Indeed, the Prossers argue that "the only condition that can be reasonably understood from the Preliminary Injunction is that [they] were to maintain the s*tatus*

*quo*" concerning the storage conditions. (Dkt. No. 48 at 38). This argument completely undercuts their position that the Orders gave them no notice of the standards they were to abide by to properly store the wine. Had the Prossers maintained the 2008 storage status quo, they would have complied with the Order. While "[a] contempt citation should not be granted if 'there is ground to doubt the wrongfulness of 'the defendant's conduct,'" *Harris,* 47 F.3d at 1350 (quoting *Quinter v. Volkswagen of Am.,* 676 F.2d 969, 974 (3d Cir. 1982)), there were no grounds for doubt here.

Moreover, "a party uncertain of its obligations under a preliminary injunction should 'petition[] the . . . Court for a modification, clarification or construction of the [O]rder.'" *Equinox Software Sys., Inc., v. Airgas, Inc.,* 1997 WL 12133, at *6 (E.D. Pa. Jan. 7, 1997) (quoting *McComb v. Jacksonville Paper Co..* 336 U.S. 187, 192 (1949)). As with the defendants in *Equinox,* the Prossers were

> under an obligation to take all reasonable steps to abide by the preliminary injunction. If [they] had any questions as to what the preliminary injunction prohibited and what it did not [they] should have sought clarification. Having foregone the opportunity to dispel the perceived ambiguity, [the Prossers] must now bear the cost of the infraction.

*Id.* (internal citation omitted). The Prossers never indicated that they did not know how to properly store the wine collection. They did not indicate that they were uncertain about their obligations or otherwise needed clarification of any of the Court's Orders. It is too late in the day for the Prossers to now claim that they lacked knowledge of how to comply with something as central to the Court's Order as the preservation of the wine. Accordingly, for all of the foregoing reasons, the Court finds that the Bankruptcy Court did not err in concluding that the Prossers had knowledge of the Orders.

The third contempt element requires proof that the defendants disobeyed the Orders. As indicated above, the Bankruptcy Court found that the Trustee provided clear and convincing evidence to show that the Prossers disobeyed the Preliminary Injunction Order, the 9019 Order, and the Turnover Order by allowing the wine to be dissipated and destroyed. This Court finds no

factual or legal error in the Bankruptcy Court's conclusion that this contempt requirement was met.

The Prossers argue in the Discussion section of their appeal brief that the wine was not destroyed or missing because: (1) Jeffrey Prosser testified that he did not change the wine storage conditions from the time of the preliminary injunction forward; (2) there was no testimony concerning the quality of the wine at the point the injunction issued, and thus the wine may have been unmarketable at that time—since Ms. Ewing-Mulligan testified that the quality of the wine deteriorated at "a minimum of 4 to 5 years"; and (3) the finding that there was a dissipation in the number of bottles was clearly erroneous because Ms. Licamara's testimony established there "was error in the inventory counts in the magnitude of over 100 bottles of wine," and there was no testimony that the Prossers participated or approved of the opening or closing inventories. (Dkt. No. 48 at 39-40).

Rule 28(a)(8) of the Federal Rules of Appellate Procedure requires appellants' contentions to be supported by "parts of the record on which the appellant relies."[14] The Third Circuit has cautioned that litigants must provide proper factual citations to their arguments in compliance with the dictates of Fed. R. App. P. 28:

> Under the Federal Rules of Appellate Procedure, appellant's opening brief must include arguments in support of the issues raised on appeal. The argument must contain 'appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies.' Fed. R. App. P. 28(a)(8)(A); *see also Simmons v. City of Phila.*, 947 F.2d 1042, 1065 (3d Cir. 1991) ("[A]bsent extraordinary circumstances, briefs must contain statements of all issues presented for appeal, together with supporting arguments and citations."). Cursory treatment of an issue does not suffice. *See Kost v. Kozakiewicz*, 1 F.3d 176, 182 (3d Cir. 1993) ("It is also well-settled . . . that casual mention of an issue in a brief is

---

[14] Fed. R. App. P. 28(a)(8)(A) provides that appellant's argument must contain "(A) appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies[.]" In addition, Fed. R. App. P. 28(e) provides that "[r]eferences to the parts of the record contained in the appendix filed with the appellant's brief must be to the pages of the appendix."

cursory treatment insufficient to preserve the issue on appeal.").

*Eddy v. Corbett,* 381 F. App'x 237, 238 (3d Cir. 2010); *see also Reynolds v. Wagner*, 128 F.3d

166, 176 (3d Cir. 1997) ("[A]n argument consisting of no more than a conclusory assertion…

(without even a citation to the record) will be deemed waived.").

 In presenting their arguments that the Bankruptcy Court clearly erred in finding that the

Prossers had disobeyed the Orders by destroying and dissipating the wine, the Prossers failed to

cite the record on appeal. The twenty-page Statement of Facts section of the brief provides facts.

However, the Law and Argument Section does not pair those facts with their applicable arguments.

The Court was thus required to toggle between the Statement of Facts and the Law and Argument

sections in an attempt to determine whether the Prossers' legal arguments are actually supported

by record facts and, if so, which facts. Fed. R. App. P. 28(a)(8) clearly contemplates that it is the

responsibility of the parties, not the Court, to link the legal argument to the facts by including cites

to the record.

 In any event, having linked the Prossers' facts with their arguments, the Court finds that

the Bankruptcy Court did not abuse its discretion in finding that the third contempt element was

satisfied. While Prosser testified that he did not change the wine storage conditions from the time

of the preliminary injunction forward, the trial testimony of Ms. Ewing-Mulligan and Ms.

Licamara, and the declaration of Charles Antin, demonstrated that the storage conditions at Shoys

Estate had decidedly deteriorated between the 2008 and 2011 visits. (A134 at 136, 144, 160, 178-

181, T243-278; A 135 at 48-50, 132-135, 138-41, 143, 148-53; T215-242, T267-269, 272-277).

Based on this evidence, the Bankruptcy Court rejected Prosser's testimony, opining: "[I]t is clear

to this court that the storage conditions at the Shoys Estate changed from 2008 to 2011 and that

such changes resulted in Christie's refusal to sell the Wines from that property. The photographs

admitted as Exhibits clearly establish changed conditions." (Dkt. No. 1005 at 18 n.23; A84).[15] The Bankruptcy Court did not abuse its discretion in so finding.

Prosser's hypothesis that the wine may have been out of condition and thus unmarketable in 2008 is pure speculation. The Prossers claim that Ms. Ewing-Mulligan stated that the quality of wine had deteriorated at "a minimum of 4 to 5 years," from which they infer that the wine had already deteriorated in 2008. (Dkt. No. 48 at 39). However, the record does not support this assertion. Ms. Ewing-Mulligan testified that, in December 2011, the wine "suffered bad storage for a few years." (A135 at 158). On cross-examination, she stated the wine could have deteriorated over "a couple of years" and that, within that "range," the deterioration could have occurred over "three or four years." (*Id.* at 177). She never stated that the wine had deteriorated at "a minimum of 4 to 5 years" as asserted by the Prossers. There is no factual support in the record to support this theory, which appears to be raised for the first time on appeal.

In the Statement of Facts section of their brief, the Prossers cite Ms. Licamara's testimony that, in December 2011, she counted 190 bottles of wine that had not been included in the 2008 inventory. (Dkt. No. 48 at 23). According to the Prossers, these 190 bottles indicated that there "was error in the inventory counts in the magnitude of over 100 bottles of wine" and thus the finding that there was dissipation of the wine was clearly erroneous. (*Id.* at 40). In its Contempt Memorandum Opinion, the Bankruptcy Court referred to additional bottles of wine found during the 2011 Palm Beach and Shoys Estate inventories that had not been present during the 2008 inventories. Ms. Licamara testified that her task was to "calculate damages on the bottles that were missing [since 2008], not extra bottles that were there" in 2011. (A135 at 87). The Bankruptcy Court observed that the wine was "not considered as a factor in the finding of civil contempt or in

---

[15] Photographs depicting changes in the storage conditions were attached to the Contempt Memorandum Opinion. (Dkt. No. 1005, Ex. A and Ex. B).

the calculation of damages" (07-ap-03010, Dkt. No. 1005 at 26 nn. 33, 34; A84).

The Prossers do not explain how the appearance of 190 new bottles between 2008 and 2011, which were not included in the 2008 inventories and were not considered as a factor in the 2011 inventories, somehow caused the 2011 inventories to be in error. If the wine was not present and therefore not included in the 2008 inventories, it was not part of the Estate, and could not be considered when assessing damages in 2011. Nor do the Prossers explain how the 190 additional bottles impacted the finding in December 2011 that 453 bottles were missing from the 2008 inventory. For these reasons, the Court finds that the Bankruptcy Court did not abuse its discretion when it found that the Prossers had dissipated their wine collection between 2008 and 2011.

Finally, the Prossers argued before the Bankruptcy Court, as they do on appeal (Dkt. No. 48 at 21), that because they—or people on their behalf—did not participate in or approve of the opening (2008) or closing (2011) inventories, the inventories should not be relied upon to determine the number of damaged and dissipated bottles. The Bankruptcy Court rejected this contention as "specious," finding, *inter alia*, that: the Prossers were in sole control of the wine and had every opportunity to count the wine or challenge the Trustee's inventories; they raised no objection to the count upon which the 50-50 split set forth in the Stipulation was made; Mrs. Prosser retained Mr. Edgerton, whose appraisal was admitted at trial; Jeffrey Prosser was privy to the inventory and valuation contained in the Edgerton Appraisal and the Bankruptcy Court found he adopted it; and the Prossers' objections that they had no opportunity to establish their own inventory was "totally incredible," as they were represented during the creation of the initial inventories, there was no evidence they were prevented from participating in the inventories, and they had the opportunity to create their own inventory if they desired to do so. (Dkt. No. 1005 at 9-13; A84).

The Prossers cite a snippet of Jeffrey Prosser's deposition testimony where he was asked

whether he knew of anyone on behalf of his wife or himself who counted the bottles of wine. (A136 at 24). He answered no but, upon further questioning, added that he had access to the wine at the Palm Beach and St. Croix residences, and nothing prevented him from counting them. (*Id.* at 25). To the extent the Prossers now make the same argument regarding the closing inventories, the same reasoning applies. Not only have they not cited any facts to support their contention, but the record shows that the Prossers were at their Palm Beach residence when the 2011 inventory was conducted (A134 at 64-65); and counsel for Dawn Prosser was present during the 2011 inventory at Shoys Estate. (A135 at 62-63). Thus, as the Bankruptcy Court concluded, the Prossers had every opportunity to participate in both the 2008 and 2011 inventories, and cannot be heard to now complain if they failed to do so. Accordingly, their arguments have no merit.

In sum, the Court finds that the Bankruptcy Court did not abuse its discretion when it found that the Trustee proved the elements of civil contempt by clear and convincing evidence.

### 3.  Claims of Theft and Unauthorized Access

The Prossers' third argument is that:

[a] fair reading of the Bankruptcy Court's Contempt decision makes clear that the Court held the Prossers to a strict liability standard. This is evident by the Court's refusal to consider the fact that the Prossers were not the only ones with access to either the Palm Beach or St. Croix Wines, and that there had been break-ins and numerous occasions on which the Trustee's representatives had to be told to leave the St. Croix property as they were there unannounced and without permission.

(Dkt. No. 48 at 41). Once again, the Prossers make factual representations in the Law and Argument section of their brief with no citations to the record.

Before the Bankruptcy Court, the Prossers expressed their concern "that a theft may have taken place at the Shoys Estate"—which purportedly served to explain the dissipation of wine at that location. (Dkt. No. 1005 at 21 n.30; A84). The Bankruptcy Court cited Dawn Prosser's equivocal deposition testimony that she "did not know for sure that any Wines were stolen

although she believed someone had possibly broken in and destroyed or consumed some Wines and used the pool at the Shoys Estate." (*Id.*) The Bankruptcy Court found there was "no sound evidence to prove that a break-in did in fact occur at the Shoys Estate" (*id.*); noted that the Prossers were "specifically ordered" to keep the wine in "secure locations" and protect them from, *inter alia,* "theft . . . pending its turnover to the Trustee"; and concluded that failure to prevent a theft of the wine was "still a violation of this court's orders, and not an appropriate defense." (*Id.*) The Bankruptcy Court observed that neither it nor the Trustee was ever informed that the Prossers "were having difficulty storing and maintaining the Wines, or that any of the Wines were missing" or stolen. (*Id.* at 20 n.26, citing A134 at 90-92).

In the Statement of Facts section of their appeal brief, the Prossers state that "the evidence was unrebutted that the Trustee, the Trustee's agents and the Trustee's employees had ongoing access to both the Palm Beach and St. Croix Wines over the years since entry of the preliminary injunction." (Dkt. No. 48 at 24). They further state that "there were numerous times when the Trustee's agents had to be asked to remove themselves from the St Croix property, as they had no permission and no prior arrangements have been made for them to be on site, and that there have been break-ins on the St. Croix property after inception of the Injunction." (*Id.* at 25).

The only factual support the Prossers provide for this position are two statements from the deposition testimony of Oakland Benta, a Prosser employee. First, Mr. Benta referred to a Mr. Henry who asked unidentified people, who had allegedly been sent by the Trustee to do an appraisal, to vacate the Shoys Estate property because they were unannounced. Second, Mr. Benta commented that, in the past year, there was a break in on "the home that's under construction" but he did not know what was taken. (A139 at 15-16). Not only do the Prossers fail to describe what "reasonable steps" they took to comply with the Order(s), but these vague snippets of Mr. Benta's testimony provide scant—if any—evidence to support what appears to be the Prossers' theory that

41

they were not responsible for the dissipation of the wine. Thus, these statements by Mr. Benta, upon which the Prossers rely in an attempt to attribute the dissipation of the wines to others and absolve themselves of responsibility, fail to show that the Bankruptcy Court abused its discretion in finding to the contrary for the reasons it articulated, and therefore provide no grounds to disturb the Bankruptcy Court's finding of contempt.

Finally, nothing in the Contempt Memorandum Opinion shows that the Bankruptcy Court applied any other standard for civil contempt than the three-pronged test set forth in *In re Davitch*, 336 B.R. at 251 (citing *Harris*, 47 F.3d at 1326). This is the proper standard, and the Bankruptcy Court did not err as a matter of law in applying it. (07-ap-03010, Dkt. No. 1005 at 25; A84).

Accordingly, the Court rejects the Prossers' strict liability argument.

### 4. Specificity and Definiteness of the Orders

Here, the Prossers argue that there is no evidence that the Orders gave them any notice of the storage conditions imposed upon them or that they would be strictly liable for any change in the quality of the wine. These two contentions reiterate the arguments asserted in Items 2 and 3, which the Court has previously rejected. In addition, the Prossers claim that the Trustee "wholly failed to produce any evidence, let alone clear and convincing evidence, that there was anyone capable of guaranteeing the quality of wines over an extended number of years." (Dkt. No. 48 at 42). However, the Trustee's burden was to show by clear and convincing evidence the three elements necessary to find the Prossers in contempt. That there may be points that the Prossers may have sought to make through the introduction of evidence or effective cross-examination to challenge the Trustee's evidence on the elements does not convert those points into necessary elements for the finding of contempt. Such is the case here. The Court therefore rejects the arguments contained in Item 4.

### 5. Burdens of Proof and Persuasion

The Prossers claim that the Bankruptcy Court "impermissibly flipped the burden of proof[16] and the burden of persuasion from the Trustee to the Prossers." (Dkt. No. 48 at 43). The Prossers add that the Bankruptcy Court never stated that the Trustee sustained his "burdens of proof and persuasion[]" by clear and convincing evidence, and that it found for the Trustee without examining the Prossers' various defenses (such as the alleged lack of specificity of the orders; the Prossers' alleged lack of control over access to the wine; the alleged impossibility of assuring the quality of the wine over an extended period of time; and the Trustee's role in publicly stating that the St. Croix wine worth hundreds of thousands of dollars had been "baked," which resulted in only $15,000 in net proceeds to the Estate). (*Id*. at 43-44). They again mention "ambiguities" in the Court's Orders, without delineating them. (*Id.* at 44). They also mention, in passing, some of their disagreements with the Bankruptcy Court's Contempt Order, without citations to the record, to explain how the Bankruptcy Court may have "flipped the burden of proof and persuasion" from the Trustee to them, or failed to examine their defenses. They also fail to provide any case citations or legal argument.

Contrary to the Prossers' assertion, the Bankruptcy Court did examine the Prossers' defense concerning the alleged lack of specificity of the Orders, (Dkt. No. 1005 at 18 n.23; A84); the Prossers alleged lack of control over access to the wine (*id*. at 21 n.30); and alleged difficulties in storing and maintaining the wine over a period of time (*id*. at 20 n.26). Further, their arguments overlap with the issues previously addressed by the Court. It is unclear whether the Prossers raised the argument questioning the Trustee's role in publicly stating the wine had been "baked" during trial as a defense to the motion for contempt, as they provide no citation to the record to guide the

---

[16] The Prossers may be referring to the burden of production.

Court in its review.

Indeed, the Court finds that the argument section purportedly supporting the Prossers' "burden of proof and persuasion" contention is patently insufficient under Fed. R. App. P. 28, as it contains pure argument divorced from any reference to the record and lacks any legal authority. *Simmons*, 947 F.2d at 1065. Except to the extent that individual aspects of this argument have already been addressed above, the Court finds that the Prossers have waived this argument. *Eddy,* 381 F. App'x at 238; *Reynolds,* 128 F.3d at 176; *Kost*, 1 F.3d at 182.

### 6.  and 7.   Limits of Obligations Imposed by Preliminary Injunction

The questions posed by Items 6 and 7 are "whether the Bankruptcy Court erred as a matter of law and abused its discretion by imposing obligations upon Mr. and Mrs. Prosser beyond those set forth in the preliminary injunction," and "whether the Bankruptcy Court erred as a matter of law and abused its discretion by imposing obligations upon the Prossers beyond those which they reasonably understood were imposed by the preliminary injunction." (Dkt. No. 48 at 44). In their brief, the Prossers state that "Issues 6 and 7 are subsumed by law, argument and facts asserted in support thereof in issues 2, 3, 4 and 5 above." (*Id.*). Accordingly, the Court incorporates herein its rulings, as discussed above, for Items 2, 3, 4, and 5.

### 8.   Insurance on Property

The eighth question presented by the Prossers is: "Whether the Bankruptcy Court erred as a matter of law and abused its discretion by assessing damages against the Prossers that resulted from the Trustee's failure to maintain insurance on the property of the Estate as required by the guidelines promulgated by the Office of the United States Trustee." (*Id.*). The Prossers assert that the Handbook for Chapter 7 Trustees, issued by the United States Department of Justice Executive Office for United States Trustees, provides, in pertinent part, that the "trustee has the duty and responsibility to insure and safeguard all estate property" and, in "cases where property appears to

44

have value for the estate, the trustee should obtain control over the property . . . and determine the extent and value of the property. The trustee should also immediately obtain insurance in an amount sufficient to protect the estate property[.]" (*Id.* at 45, quoting Handbook for Chapter 7 Trustees). The Prossers argue that the Trustee had a duty to insure the wine in this case and, had the Trustee "not breached his duty to insure Estate property, the Estate would have recouped the claimed loss in the number of bottles so insured." (*Id.*) They claim that the damages suffered by the Estate directly result from "the Trustee's own malfeasance." (*Id.*)

In their Reply Brief, the Prossers did not challenge the assertion in the Trustee's brief that they raised this issue for the first time on appeal. Nor did the Prossers provide a citation to the record on appeal to show where the issue was previously raised, and whether the Bankruptcy Court addressed and ruled on the issue. The Court therefore concludes that the Prossers introduced this argument for the first time on appeal. As a result, the argument has been waived, and will not be addressed further by the Court. *Int'l Fin. Corp. v. Kaiser Group Int'l (In re Kaiser Group Int'l, Inc.)*, 399 F.3d 558, 565 (3d Cir. 2005) (holding that "when a party fails to raise an issue in the bankruptcy court, the issue is waived and may not be considered by the district court on appeal") (citing *Buncher Co. v. Official Comm. of Unsecured Creditors of GenFarm LP IV*, 229 F.3d 245, 253 (3d Cir. 2000)); *see also Hatchigian v. State Farm Ins. Co.,* 574 F. App'x 103, 104 (3d Cir. 2014) (stating that argument not raised before court below and raised for first time on appeal is waived) (citing *B.S. v. Somerset Cnty.,* 704 F.3d 250, 267 n.28 (3d Cir. 2013)); *In re Natale*, 280 F. App'x 227, 229 (3d Cir. 2008) ("A finding of waiver is appropriate particularly where 'the evidence in the record is insufficient to permit a court to realistically' decide the issue.'") (quoting *Buncher Co.,* 229 F.3d at 253)).

### 9. *Daubert* Motion Ruling

The ninth issue presented by the Prossers is: "Whether the Bankruptcy Court erred as a

matter of law and abused its discretion in overruling the Prossers' *Daubert* Motion." (Dkt. No. 48 at 46). The Prossers assert that the Trustee offered, and the Court accepted, "expert testimony with regard to the willful and intentional destruction of the quality [of] Shoys Wines in unopened and in many cases unexamined bottles" which, they claim, is "simply beyond the purview of any expert analysis." (*Id.* at 49). They argue that there were no scientific facts or data upon which Ms. Ewing-Mulligan based her quality and marketing determinations or Mr. Charles Antin based his marketing determinations. They also argue that the Trustee failed to establish all of the *Daubert* factors as a precondition to admissibility, and therefore the Court erred in accepting Ms. Ewing-Mulligan's and Mr. Antin's testimony. (*Id.* at 50-51).

At trial, the Bankruptcy Court overruled the Prossers' *Daubert*-based objections, and ruled that the issues raised by the Prossers went to the weight to be accorded Ms. Ewing-Mulligan's testimony, not to her qualifications. (A135 at 121). In its Contempt Memorandum Opinion, the Bankruptcy Court summarized its ruling at trial:

> Ms. Ewing-Mulligan was retained by the Chapter 7 Trustee to determine the soundness and marketability of the Wines at the Shoys Estate. She testified at trial, was qualified as an expert and was permitted to give an opinion as to the marketability and quality of the Wines as well as to the condition of the storage of the Wines. Trial Tr. 121:7-121:19, Feb. 2, 2012; Case No. 06-30009, ECF No. 3674, Mar. 12, 2012.

(Dkt. No. 1005 at 20 n.27; A84).

The introduction of expert opinion testimony is governed by Rule 702 of the Federal Rules of Evidence. Rule 702 provides that a witness qualified as an expert by knowledge, skill, experience, training or education may provide opinion testimony if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case. Fed. R. Evid.

702.[17] A trial judge "acts as a 'gatekeeper,' preventing opinion testimony that does not meet these requirements from reaching the jury." *Mercedes-Benz USA, Inc. v. Coast Auto. Group, Ltd.*, 362 F. App'x 332, 334 (3d Cir. 2010) (citing *Daubert*, 509 U.S. at 592-95).

The Third Circuit has stated that "Rule 702 has three major requirements: (1) the proffered witness must be an expert, *i.e.*, must be qualified; (2) the expert must testify about matters requiring scientific, technical, or specialized knowledge [*i.e.*, reliability]; and (3) the expert's testimony must assist the trier of fact[, *i.e.*, fit]." *United States v. Schiff*, 602 F.3d 152, 172 (3d Cir. 2010) (quoting *Pineda v. Ford Motor Co.*, 520 F.3d 237, 244 (3d Cir. 2008) (internal quotations omitted)); *see also Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003) ("Rule 702 embodies a trilogy of restrictions on expert testimony: qualification, reliability and fit."). "The party offering the expert must prove each of these requirements by a preponderance of the evidence." *Mahmood v. Narciso*, 549 F. App'x 99, 102 (3d Cir. 2013) (citing *In re TMI Litig.*, 193 F.3d 613, 663 (3d Cir. 1999)).

To qualify as an expert under Rule 702, "the witness [must] possess specialized expertise." *Schneider*, 320 F.3d at 404. The Third Circuit has "emphasized that the 'specialized expertise' requirement is a liberal one: 'a broad range of knowledge, skills, and training [may] qualify an

---

[17] The full text of Rule 702 provides as follows:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>> (b) the testimony is based on sufficient facts or data;
>> (c) the testimony is the product of reliable principles and methods; and
>> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.

expert as such.'" *De La Cruz v. V.I. Water & Power Auth.*, 597 F. App'x 83, 91 (3d Cir. 2014)

(quoting *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 741 (3d Cir. 1994) (alteration in *De La*

*Cruz*)).

To establish reliability, the expert's opinion "must be based on the 'methods and

procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert

must have 'good grounds' for his or her belief." *In re Paoli*, 35 F.3d at 742 (quoting *Daubert*, 509

U.S. at 590). In assessing whether a particular methodology is reliable, the Third Circuit has held

that courts should consider the following, non-exhaustive factors:

> (1) whether a method consists of a testable hypothesis; (2) whether the method has
> been subject to peer review; (3) the known or potential rate of error; (4) the
> existence and maintenance of standards controlling the technique's operation; (5)
> whether the method is generally accepted; (6) the relationship of the technique to
> methods which have been established to be reliable; (7) the qualifications of the
> expert witness testifying based on the methodology; and (8) the non-judicial uses
> to which the method has been put.

*Pineda*, 520 F.3d at 247-48 (citations omitted).

In *Kumho Tire Co., Ltd. v. Carmichael,* 526 U.S. 137 (1999), the Supreme Court addressed

"how *Daubert* applies to the testimony of . . . other experts who are not scientists," but who

nevertheless possess "technical" and "other specialized" knowledge under Fed. R. Evid. 702. *Id.*

at 141. The Court ruled that *Daubert*'s list of specific factors does not necessarily or exclusively

apply to all experts or in every case, and that a district court has "broad latitude" when determining

how to assess reliability as well as in its ultimate reliability determination. *Id.* at 142; *see id.* at 152

("[T]he trial judge must have considerable leeway in deciding in a particular case how to go about

determining whether particular expert testimony is reliable."). The Court added that, in some cases,

the expert testimony may have a scientific foundation; in other cases, "the relevant reliability

concerns may focus on personal knowledge or experience," where the court's gatekeeping inquiry

is "tied to the facts of a particular case." *Id.* at 150 (internal quotation marks omitted). Finally,

[w]hile a litigant has to make more than a prima facie showing that his expert's methodology is reliable, we have cautioned that '[t]he evidentiary requirement of reliability is lower than the merits standard of correctness'; *see also In re TMI Litig.*, 193 F.3d at 665 (stating that "the standard for determining reliability is not that high, even given the evidentiary gauntlet facing the proponent of expert testimony under Rule 702').

*Pineda*, 520 F.3d at 241 (quoting *In re Paoli,* 35 F.3d at 742).

To determine fit, expert testimony "must be relevant for the purposes of the case and must assist the trier of fact." *Calhoun v. Yamaha Motor Corp., U.S.A.*, 350 F.3d 316, 321 (3d Cir. 2003) (quoting *Schneider*, 320 F.3d at 405) (internal quotation marks omitted)). In other words, it must be "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Schiff*, 602 F.3d at 173 (quoting *Daubert*, 509 U.S. at 591).

As noted above, the arguments the Prossers made under Item 9 are that: (1) the Bankruptcy Court erred in accepting expert testimony regarding the wine "in unopened and in many cases unexamined bottles," which, they claim, is "simply beyond the purview of any expert analysis" and did not satisfy the *Daubert* reliability requirement; (2) the testimony of Ms. Ewing-Mulligan and Mr. Antin "establishes that there were no scientific facts or data upon which Ms. Ewing-Mulligan's quality and marketing determinations, or Mr. Antin's marketing determinations were based," but was "indicative of a preconceived prejudice to the Trustee's asserted position"; and (3) the Trustee did not establish all of the *Daubert* factors as a precondition to the admissibility of the proposed testimony. (Dkt. No. 48 at 49-50).

As a preliminary matter, the declaration of Charles Antin (A101) was offered by the *Prossers* in support of *their* case, and Mr. Antin was not offered as an expert. (A135 at 204).[18] Therefore, not only does the Prossers' *Daubert* argument not apply to him, but, "[g]enerally, a

---

[18] In addition, the Prossers' *Daubert* Motion did not challenge Mr. Antin's testimony but rather cited it in support of the Prossers' position. (07-ap-03010, Dkt. No. 913 at 5-7).

party introducing evidence cannot complain on appeal that the evidence was erroneously admitted." *Ohler v. United States*, 529 U.S. 753, 755 (2000) (citing 1 J. Weinstein & M. Berger, *Weinstein's Federal Evidence* § 103.14, p. 103-30 (2d ed. 2000)). The Prossers' *Daubert* arguments concerning Mr. Antin therefore fail.

Turning to Ms. Ewing-Mulligan, as well-established case law demonstrates, the non-exhaustive *Daubert* factors "need not be applied in every case," *Elcock v. Kmart Corp.*, 233 F.3d 734, 746 (3d Cir. 2000), particularly where "experts who are not scientists," but who nevertheless possess "technical" and "other specialized" knowledge, provide their opinion. *Kumho Tire* 526 U.S. at 141. Ms. Ewing-Mulligan's expertise, and the methodology she used to form her opinions, did not arise from applying the "methods and procedures of science" to an assessment of the quality and marketability of the wine, *Daubert*, 509 U.S. at 590, but "from a set of observations based on [her] extensive and specialized experience." *Kumho Tire*, 526 U.S. at 156; *see id.* at 150 (relevant reliability concerns may focus on personal knowledge or experience). Thus, to the extent that the Prossers' argue that the Trustee did not establish all of the *Daubert* factors as a precondition to the admissibility of the proposed testimony, such an argument is inapt in the present context. Equally inapt is the notion that there must be a scientific foundation for every expert opinion, leaving no room for opinions based on knowledge of, or experience in, a given field. *See id.* The Prossers' *Daubert* arguments are plagued by these inapt contentions and are therefore fatally flawed.

The Prossers repeat on appeal the contention they made before the Bankruptcy Court that Ms. Ewing-Mulligan could not opine on the quality of wine in a bottle that had not been opened and tasted. However, there is no evidence that taste testing is the only way to assess the quality and marketability of wine. To the contrary, while Ms. Ewing-Mulligan stated that, in order to make a judgment of the specific liquid in a specific bottle, one would have to taste it (A135 at 116), she emphasized that storage conditions indicate how the wine would taste (*id.* at 108); the integrity of

50

the label is part of the judgment made about the condition of the wine (*id.* at 119-20); and that the quality of wine in a bottle may also be evaluated by its color and fill level. (*Id.* at 120). Ms. Ewing-Mulligan tied the quality of a wine to its marketability, adding that the market value of wine is not determined by taste. (*Id.* at 116). She noted that marketability depends on "[t]he reputation of the property, the quality of the vintage year, and the conditions of storage of a specific bottle or case of that wine." (*Id.* at 119). Given this evidence of record, the Bankruptcy Court did not abuse its discretion in finding that Ms. Ewing-Mulligan's methodology of assessing the quality and marketability of the wine—based on her specialized knowledge and extensive professional experience and expertise in the wine industry—was reliable under *Daubert*.

Moreover, Ms. Ewing-Mulligan's expert report noted that the wine stored at Shoys Estate in December 2011 was "not a uniform lot," with some wine in their original cases, some as loose bottles; some with insect damage to their labels and some with no damage; some that were significantly and inexplicably warmer to the touch than others; and some with acceptable fill levels and others not. (07-ap-3010, Dkt. No. 915-2; T215-40). Because of the "chaotic arrangement" of the bottles, Ms. Ewing-Mulligan found that "it was impossible to view the wines as separate lots, some of which might be in better condition than others." (*Id.* at 5). Based on the six bottles that she opened, tasted, and of which she took the temperature, she extrapolated to the rest of the wine and concluded that the storage conditions—temperature, humidity, light, cleanliness, and water leakage—affected each bottle individually and caused the wine, collectively, to be ruined. (*Id.*)

Accordingly, Ms. Ewing-Mulligan's taste-testing and knowledge of the conditions under which the wine was stored provided "good grounds" for her belief that the wine was ruined and not marketable, *In re Paoli*, 35 F.3d at 742, and did not run afoul of *Daubert*. Thus, her conclusion that the wine was unsound and unmarketable was not based on "subjective belief or unsupported speculation," *id.*, and lays to rest the Prossers' contention that because of the "subjectivity" of the

51

taste of wine, its quality and marketability could not be determined.

In the final analysis, it appears that the main thrust of the Prossers' *Daubert* argument is a challenge to Ms. Ewing-Mulligan's conclusions with which they disagreed. Once an expert has made a sufficient showing that her methodology is reliable, the proper avenue for the opposing party to attack that expert's assumptions, inferences, and conclusions is via cross-examination, which is exactly what the Prossers did. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 154 (197) ("*Daubert* quite clearly forbids trial judges to assess the validity or strength of an expert's scientific conclusions, which is a matter for the jury.") (Stevens, J., concurring in part and dissenting in part); *De La Cruz*, 597 F. App'x at 92 (observing that "[w]hatever weaknesses" plaintiff's expert identified in defendant's expert's methods, "they were sufficiently grounded in science to be offered in court and then attacked on cross-examination."); *Stecyk,* 295 F.3d at 414 ("Rule 705, together with Rule 703, places the burden of exploring the facts and assumptions underlying the testimony of an expert witness on opposing counsel during cross-examination" and "[a] party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination."). The fact that the Bankruptcy Court did not agree with the Prossers' arguments does not constitute an abuse of discretion. In short, the Prossers point to nothing in the record that calls the Bankruptcy Court's conclusion into question.[19]

---

[19] In the Statement of Facts section of their appeal brief, the Prossers also questioned Ms. Ewing-Mulligan's qualifications by pointing out that she had not previously testified in a court proceeding concerning quality of wine. (Dkt. No. 48 at 30). In *United States v. Wrensford*, 2014 WL 3715036, at *11 (D.V.I. July 28, 2014), this Court rejected the assertion that an expert was not qualified simply because he had qualified as an expert only two or three times previously. The Court quoted *Demouchette v. Dart*, 2012 WL 6568232, at *8 (N.D. Ill. Dec. 14, 2012): "The issue of whether a court has previously qualified [a particular person] as an expert is irrelevant to a determination of whether he has the necessary knowledge, skill, experience, training or education to qualify him as an expert under Rule 702." (quoting *Catapult Comm'cns Corp. v. Foster*, 2010 WL 659072, at *2 (N.D. Ill. Feb. 19, 2010) ("The mere fact that [a proposed expert] never has been retained as an

In view of the foregoing, the Court finds that the Bankruptcy Court did not abuse its discretion in admitting Mr. Antin's non-expert testimony or Ms. Ewing-Mulligan's expert report and testimony. The Prossers' arguments contained in Item 9 are therefore rejected.

### 10. Ruling on Motion to Abandon

The tenth issue presented by the Prossers is: "Whether the Bankruptcy Court erred as a matter of law and abused its discretion in denying [the] Prossers' motion to abandon the wines in light of the Trustee's claim that the wines were destroyed and of no value." (Dkt. No. 48 at 51).

On August 21, 2011, the Prossers filed a motion pursuant to 11 U.S.C. § 554(b) requesting that the Bankruptcy Court order the Trustee to abandon the wine remaining at the Shoys Estate residence. (06-bk-30009, Dkt. No. 3310).[20] They claimed that the Bankruptcy Court should order that the wine be abandoned because the Trustee had taken the position that the wine had been dissipated and destroyed, which they viewed as equivalent to the Trustee's abandonment of the wine. (*Id.*) The Trustee objected, stating that the motion was not ripe for adjudication because, at an August 30, 2011 hearing, the Bankruptcy Court had ordered an independent analysis of the wine's value and marketability by a third-party expert, and had stated that it would not rule on abandonment of the wine until the expert determined that the wine could either be sold or that it had no value and could not be sold. (06-bk-30009, Dkt. No. 3354).

---

expert is irrelevant. By that logic, *no witness* could ever qualify as an expert for the first time because that would require being retained *previously* as an expert.")). Based on Ms. Ewing-Mulligan's Master of Wine credential, her extensive experience in the wine business, and her ownership of the International Wine Center that teaches courses on wine, the Bankruptcy Court did not abuse its discretion in finding that Ms. Ewing-Mulligan was qualified to render an opinion on quality and marketability of wine.

[20] 11 U.S.C. § 554(b) provides as follows:

> On request of a party in interest and after notice and a hearing, the court may order the trustee to abandon any property of the estate that is burdensome to the estate or that is of inconsequential value and benefit to the estate.

At another hearing on the motion for abandonment, held on July 18, 2012—after the contempt trial had been held but before a decision had been rendered—the Trustee's counsel observed that, on the one hand, Prosser was claiming the wine had value and was perfectly fine but, on the other hand, the Trustee's expert, Ms. Ewing-Mulligan, had testified that the wine was not marketable. The Trustee asserted that he did not want to be in a position where he agreed to abandon the wine and the Court later determined that it had value, which would open the Trustee to criticism. (07-ap-03010, Dkt. No. 987 at 130).

At the July 18, 2012 hearing, the Bankruptcy Court denied the motion for abandonment, opining that "there ought to be an auction of this wine" to determine if it had any value and, at the auction, "everybody will be there to see the condition of the wine itself, the bottles themselves. . . So if somebody shows up to bid, somebody will bid. And if no one shows up to bid, nobody will be there to bid and that will set whatever the value is." (*Id.* at 132-33). In essence, the Bankruptcy Court opted to allow the market to determine whether the wine had value and whether a sale could benefit the estate, or if it had no value and could properly be abandoned pursuant to 11 U.S.C. § 554(b).

In their brief on appeal, the Prossers claim that the Trustee and his counsel "r[an] up over half $1 million in fees and expenses for the purpose of punishing the Prossers" and the Bankruptcy Court aided the "Trustee's vendetta against the Prossers" by denying their motion for abandonment. (Dkt. No. 48 at 51, 52). The Prossers provide no record support for their claims that the Trustee was seeking to punish them and had a "vendetta" against them; do not address the abandonment standard; provide no case law in support of their position; and do not attempt to explain how the Bankruptcy Court made an error of fact or law in denying the motion. Consequently, the Court rejects this argument as unsupported.

Even if the Court were to address the merits of the argument, it would find that the

Bankruptcy Court did not err as a matter of law and did not clearly err as a matter of fact in denying the Prossers' motion to abandon. Given the divergent opinions as to whether the wine had great or "inconsequential" value, one available way that the Bankruptcy Court could determine whether the wine actually had "inconsequential value" and should be abandoned was to test its value in the marketplace by holding an auction. [21] The Prossers' argument to the contrary fails to demonstrate legal or factual error in this conclusion.

### 11. Trustees' Sale of the Wine

The eleventh issue presented by the Prossers is: "Whether the Bankruptcy Court erred as a matter of law and abused its discretion in recognizing the Trustee's sale of wines as commercially reasonable." (Dkt. No. 48 at 53). The Prossers state that, "[p]ursuant to the May 24, 2013 Supplemental Sanctions Award, the Court accepted the commercial reasonableness of the[] Trustee's sale of the St. Croix Wines," which resulted in approximately $15,000.00 in benefit to the Estate.[22] However, the Court

> totally ignored the fact that the publicity generated by the Trustee resulted in public disparagement of those Wines throughout the Virgin Islands. As a consequence, what would have otherwise been hundreds of thousands of dollars of premium quality wine including unopened cases of *premier cru* French Bordeaux was sold for pennies on the dollar. Under the circumstances, the price received was shocking to the conscience.

(Dkt. No. 48 at 53). They claim that it was error for the Bankruptcy Court to have approved the Trustee's sale, which was commercially unreasonable, and that, as a result, they are entitled to be

---

[21] In addition, as the Trustee correctly notes: "If the Bankruptcy Court had required the Trustee to abandon the Wine, an unfortunate precedent would have been set—a debtor could undertake a course of action to destroy or misplace a valuable estate asset in violation of court orders requiring protection of that asset, and then seek to require the trustee to abandon the damaged asset to the debtor. Such a result would create an incentive for debtors to destroy estate [assets] and/or conceal them." (Dkt. No. 49 at 59).

[22] The Supplemental Sanctions Order contains no finding of the commercial reasonableness of the sale of the wine. (07-ap-03010, Dkt. No. 1078; A142).

relieved of any claimed deficiency arising from that sale. (*Id.*)

The Prossers have set forth no facts supporting their contention that the Trustee was responsible for generating publicity that had a negative effect on the sale of the wine, or that in the absence of any such publicity the wine would have been worth "hundreds of thousands of dollars." (*Id.*) Nor have the Prossers provided any legal standard against which to assess their argument, including whether "shocking to the conscience" is the appropriate standard, or any legal authority to support their position, including why the appropriate remedy on appeal would be that they would be relieved from responsibility for *any* deficiency caused by their damage to and dissipation of the wine. Not only does the Court reject the argument contained in Item 11 as unsupported, either factually or legally, but finds that it is patently insufficient under Fed. R. App. P. 28, and is therefore waived. *Eddy,* 381 F. App'x at 238; *Reynolds,* 128 F.3d at 176; *Kost,* 1 F.3d at 182.

### 12. Attorney's Fees

The twelfth issue raised by the Prossers is: "Whether the Bankruptcy Court erred as a matter of law and abused its discretion by imposing an award of attorney's fees and expenses against the Prossers which bore no reasonable relationship to the amount at issue in the contempt proceeding." (Dkt. No. 48 at 54).

On January 18, 2013, the Court entered the "Contempt Fees Order" which granted the Trustee's Supplemental Fee Application and directed the Prossers to pay the Trustee fees and costs incurred in litigating the underlying adversary proceeding, totaling $528,086.07, within thirty days. (07-ap-03010, Dkt. No. 1023; A90).

On appeal, the Prossers complain that it was unreasonable for the Trustee and his counsel to expend such sums in litigating against them, especially since the Bankruptcy Court had determined the Prossers were of "such insufficient net worth as to justify the imposition of the Preliminary Injunction in the first instance[.]" (Dkt. No. 48 at 54). They assert that these costs

56

were not undertaken in good faith or as a reasonable exercise of the Trustee's business judgment. (*Id.*) Citing 11 U.S.C. § 330, they conclude that the attorney's fees and expenses were not necessary to the administration of the estate and it was reversible error for the Court to conclude that they were. (*Id.* at 54-55).[23]

The Prossers' two-paragraph argument is completely conclusory. Their statement that the Trustee did not undertake those costs in good faith is unsupported by any reference to the record or to applicable law. They quote *In re Strand*, 375 F.3d 854 (9th Cir. 2004), which provides that a determination of a "reasonable fee" under 11 U.S.C. § 330 is achieved by answering five questions, but they do not address those five questions to support their contentions that the fees here were unreasonable or otherwise unauthorized.[24] The Court therefore rejects the argument contained in Item 12, given its patent inadequacy. *See* Fed. R. App. P. 28(a)(8); *Eddy,* 381 F. App'x at 238; *Reynolds*, 128 F.3d at 176; *Kost*, 1 F.3d at 182; *Simmons*, 947 F.2d at 1065.

---

[23] 11 U.S.C. § 330(a)(1) provides: "After notice to the parties in interest and the United States Trustee and a hearing. . . the court may award to a trustee. . . (A) reasonable compensation for actual, necessary services rendered by the trustee. . . professional person, or attorney and by any paraprofessional employed by any such person; and (B) reimbursement for actual, necessary expenses." 11 U.S.C. § 330(a)(1)(A) & (B).

[24] The *In re Strand* quotation provides:

> A determination of a reasonable allowance under § 330 is achieved by answering the following five questions:
> (1) Were the services authorized?
> (2) Were the services necessary or beneficial to the administration of the estate at the time they were rendered?
> (3) Are the services adequately documented?
> (4) Are the fees requested reasonable, taking into consideration the factors set forth in § 330(a)(3)?
> (5) Did the professional exercise reasonable billing judgment?

*In re Strand*, 375 F.3d at 860.

### 13. Exempt Property

The final issue raised by the Prossers is: "Whether the Bankruptcy Court erred as a matter of law and abused its discretion in administering property previously determined to be exempt from Bankruptcy Court administration." (Dkt. No. 48 at 55). The Prossers argue that the Bankruptcy Court "erred as a matter of law and abused its discretion" when it allowed the Trustee to administer property—the Anna's Hope Property—that it had previously determined was exempt from administration, to pay for damages and fees. (*Id.*) They contend that 11 U.S.C. § 522(k) "prohibits the remedy allowed by the [Bankruptcy] Court" to "surcharge" the Debtor's exemptions to cover costs of administrative expenses incurred by the Trustee. (*Id.* at 55-57).

The Trustee responds that he is a creditor holding a claim against both Jeffrey and Dawn Prosser; property is exempt from a bankruptcy estate if applicable nonbankruptcy law exempts such property from process; in the Virgin Islands, property held as tenants by the entirety is not exempt from process as to creditors of both spouses; and therefore the Anna's Hope Property is not exempt as to the Trustee. (Dkt. No. 49 at 52-53). The Trustee adds that Section 105(a), which permits a bankruptcy court to impose civil contempt to enforce its orders, allows a court great discretion to impose a wide range of sanctions to coerce compliance with those orders, including incarceration. And, even if the Court finds the Anna's Hope Property is exempt, Section 105(a) authorizes the Bankruptcy Court to order the transfer of the property to the Estate. (*Id.* at 53-54). The Trustee claims that the Prossers' continuous and repeated contempt of the Bankruptcy Court's Orders, which caused the expenditure of significant estate and judicial resources, fully justifies that court's exercise of its Section 105 authority to correct the Prossers' misconduct. (*Id.* at 54-56).

In a Chapter 7 bankruptcy proceeding, the Trustee is appointed "to administer the case and

liquidate the debtor's nonexempt assets." *In re Messina*, 687 F.3d 74, 79 (3d Cir. 2012). "The Bankruptcy Code specifies the types of property debtors may exempt, as well as the maximum value of the exemptions a debtor may claim in certain assets." *Id.* A debtor may protect specific property as exempt under either federal bankruptcy law or the laws of the debtor's home state. 11 U.S.C. § 522(b).

Prosser claimed an exemption in the Anna's Hope Property under 11 U.S.C. § 522(b)(3)(B), which provides that an individual debtor may exempt from property of the estate:

> any interest in property in which the debtor had, immediately before the commencement of the case, an interest as a tenant by the entirety or joint tenant to the extent that such interest as a tenant by the entirety or joint tenant is exempt from process under applicable nonbankruptcy law.

11 U.S.C. § 522(b)(3)(B). The "applicable nonbankruptcy law" contemplated by the statute is state law—here, the law of the Virgin Islands. In *In re Prosser*, 2013 WL 594312 (Bankr. D.V.I. Feb. 14, 2013), the Bankruptcy Court addressed, *inter alia*, objections filed by the Chapter 7 Trustee and others to the exemptions claimed by Prosser—including the exemption to the Anna's Hope Property. Prosser claimed an unlimited exemption in the Anna's Hope Property pursuant to § 522(b)(3)(B) by virtue of the fact that that he owned the property with Dawn Prosser as tenants by the entirety and that, under "applicable nonbankruptcy law," the Anna's Hope Property was "exempt from process except as to joint creditors." *Id.* at *4-5. The Bankruptcy Court overruled the Trustee's objections and found that Jeffrey Prosser "may exempt his entireties interest in Anna's Hope under § 522(b)(3)(B)." *Id.* at *6, *8. Thus, the Bankruptcy Court found that the Anna's Hope Property is exempt from the bankruptcy estate.

The Trustee nonetheless asserts on appeal that, under Virgin Islands law, "property held as tenants by the entirety is exempt from process as to creditors of an individual spouse, but is not exempt from process as to creditors of both spouses." (Dkt. No. 49 at 53). The Trustee is apparently

arguing that because he became a creditor of both spouses once the Contempt Fees Order directed the Prossers to pay $528,086.07 in January 2013 and the Supplemental Sanctions Order directed them to pay $419,135.59 in May 2013, the Anna's Hope Property is no longer exempt and may be used to pay those damages and fees.

This argument lacks merit. "A debtor's estate is created on the date a case is commenced under the Bankruptcy Code. 11 U.S.C. § 541(a). The estate consists of all assets listed in the debtor's schedules, including those in which the debtor has claimed an exemption. . . . 'Anything properly exempted passes through bankruptcy; the rest goes to the creditors.'" *Bierbach v. Brooks (In re Brooks)*, 393 B.R. 80, 84 (Bankr. M.D. Pa. 2008) (quoting *Payne v. Wood*, 775 F.2d 202, 204 (7th Cir. 1985)). "Whether property may be claimed as exempt is determined as of the date of the petition." *Id.*

The existence of the Prossers' "joint debt" to the Trustee did not exist on the petition date, but was generated years after the petition was filed as a result of the contempt-related litigation. The Trustee has provided no case law or other authority to support the position that he was, or became, a "creditor" of the Estate as a result of *post-petition* expenses incurred by the Prossers which may provide him access to otherwise exempt property.

The salient issue presented, then, is whether the sanction authority provided by § 105(a), following a finding of civil contempt, permitted the Bankruptcy Court to order the transfer of the Anna's Hope Property to the Trustee—even though the property was exempt—in order to be sold and thereby reimburse the Trustee for the administrative expenses he incurred in the contempt and sanctions litigation and reimburse the Estate for the destruction and dissipation of Estate property.

Key to the Prossers' argument is the text of 11 U.S.C. § 522(k), which provides, in pertinent part, that property a debtor claims as exempt is not liable for the payment of *any* administrative

expenses except in two situations not relevant here.[25] They assert that, pursuant to § 522(k), the Trustee may not use the exempt Anna's Hope property to pay the Trustee's legal fees and expenses. The Trustee does not address this point directly; he simply asserts that the Bankruptcy Court has "great discretion" to impose sanctions to coerce compliance with its orders. (Dkt. No. 49 at 53).

A Supreme Court case decided while the Prosser consolidated cases were on appeal resolves the question of whether the Trustee may use exempt assets—the Anna's Hope Property— to pay the Trustee's administrative expenses assessed in the Contempt Fees Order, as followed by the Compliance and Rule 70 Orders.

In *Law v. Siegel,* 134 S. Ct. 1188 (2014), the Supreme Court addressed the question of whether a debtor's exempt property could be used to pay administrative expenses (legal fees and expenses) incurred by a Chapter 7 Trustee in challenging a lien on the debtor's home.[26] The bankruptcy court found that the lien at issue was a fiction created by the debtor to preserve his equity in the house, and granted the Trustee's motion to "surcharge" the debtor's $75,000 homestead exemption to defray the attorney's fees incurred by the Trustee in overcoming the

---

[25] 11 U.S.C. § 522(k) provides:

Property that the debtor exempts under this section is not liable for payment of any administrative expense except—
  (1) the aliquot share of the costs and expenses of avoiding a transfer of property that the debtor exempts under subsection (g) of this section, or of recovery of such property, that is attributable to the value of the portion of such property exempted in relation to the value of the property recovered; and
  (2) any costs and expenses of avoiding a transfer under subsection (f) or (h) of this section, or of recovery of property under subsection (i)(1) of this section, that the debtor has not paid.

[26] The Court found that the Trustee's legal fees and expenses constituted administrative expenses, which are defined in 11 U.S.C. § 503(b)(1)(A)(i) to include "the actual, necessary costs and expenses of preserving the estate, including--wages, salaries, and commissions for services rendered after the commencement of the case." *See Law,* 134 S. Ct. at 1195.

debtor's fraudulent misrepresentations concerning the alleged lien. The Ninth Circuit Bankruptcy Appellate Panel ("BAP") affirmed. *Law*, 2009 WL 7751415 (9th Cir. BAP, Oct. 22, 2009). In doing so, the BAP cited a leading "surcharge" case, *Latman v. Burdette*, 366 F.3d 774 (9th Cir. 2004), as providing support for its conclusion. *Id.* at *5, *7. The Court in *Law* described *Latman* as holding that a bankruptcy court may equitably surcharge a debtor's statutory exemptions in exceptional circumstances, such as "'when a debtor engages in inequitable or fraudulent conduct.'" *Law*, 134 S. Ct. at 1194 (quoting *Law*, 2009 WL 7751415 at *5, *7).[27]

In its analysis, the Supreme Court began by citing § 105(a), which provided the statutory authority to "issue any order . . . necessary or appropriate to carry out the provisions" of the Bankruptcy Code. *Id.* The Court then described the limits on that power, as § 105(a) "'does not allow the bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code'" by taking action that the Code prohibits. *Id.* (quoting 2 Collier on Bankruptcy ¶ 105.01[2], p. 105-6 (16th ed. 2013)). The Court reasoned that the "surcharge" of the exempt assets would be unauthorized if it contravened specific provisions of the Code, and found that the surcharge in fact violated two provisions: § 522(b)(3)(A), which entitled the debtor to exempt $75,000 of equity in his home from the bankruptcy estate and, significant to the Prosser case, § 522(k) which made the $75,000 homestead exemption "not liable for payment of any administrative expense." *Id.* at 1195. Finding that the reasonable attorney's fees incurred by the trustee in defeating the fraudulent lien were "indubitably an administrative expense," the Supreme Court held that the Bankruptcy Court "violated § 522's express terms when it ordered that the [exempt] $75,000 protected by [the debtor's] homestead exemption be made available to pay [the Trustee's] attorney's fees, an

---

[27] *Latman* also stated that a bankruptcy court may equitably surcharge a debtor's statutory exemptions "when reasonably necessary both to protect the integrity of the bankruptcy process and to ensure that a debtor exempts an amount no greater than what is permitted by the exemption scheme of the Bankruptcy Code." *Latman*, 366 F.3d at 786.

administrative expense." *Id.* The Supreme Court concluded that the Bankruptcy Court "exceeded the limits of its authority under § 105(a) and its inherent powers." *Id.*

*Law,* therefore, stands for the proposition that § 105(a)—the same statutory basis for the Bankruptcy Court's issuance of the contempt sanctions in the Prosser case—cannot overcome § 522(k)'s express command that property exempted by the debtor under § 522 "is not liable for payment of *any* administrative expense." 11 U.S.C. § 522(k) (emphasis added). The breadth of the word "any" leads the Court to conclude that, although *Law* concerned administrative expenses incurred in a Trustee's challenge to a lien on a debtor's home, and this case involves administrative expenses incurred in a Trustee's challenge which resulted in a finding of contempt, that difference in procedural posture would not warrant a different result than the Supreme Court reached in *Law.*[28] In this case, the Prossers were ordered to transfer the Anna's Hope Property, which was exempt property, to pay the Trustee's attorney's fees and expenses—administrative expenses under § 522(k)—as set forth in the Contempt Fees Order, the Compliance Order, and the Rule 70 Order. By ordering the transfer of the Anna's Hope exempt property to the Chapter 7 Trustee to pay the Trustee's attorney's fees and expenses, the Bankruptcy Court violated § 522(k)'s express terms and the dictates of *Law,* and exceeded the limits of its authority under § 105(a). This Court therefore concludes that the Bankruptcy Court erred when it ordered the transfer of the Anna's Hope exempt property to pay the $528,086.07 owed by the Prossers pursuant to the Compliance Order and the Rule 70 Order.

---

[28] In the American Bankruptcy Institute Northeast 10th Annual Consumer Forum, held from July 9-11, 2015 (070915 ABI-CLE 525), a paper entitled "Exemption Strategies after *Law v. Siegel*" was presented which commented on how exemptions would be treated following *Law*: "[T]he power of a trustee to surcharge assets claim[ed] as exempt by a debtor would seem to be completely abrogated. The Supreme Court apparently left no room to distinguish its holding or to provide for any circumstance in which such power could be invoked. At the very least, no case has appeared in contradiction to the Supreme Court's holding or dicta in *Law*."

The Supreme Court's ruling in *Law* does not resolve all of the issues raised in Item 13. The Prossers focus on the text of § 522(k) as prohibiting the Trustee's use of the sale of the exempt Anna's Hope Property to pay the Trustee's administrative expenses. (Dkt. No. 48 at 55). They also cite other cases—*i.e.*, *In re Scrivner*, 535 F.3d 1258, 1264 (10th Cir. 2008) and *In re Sadkin*, 36 F.3d 473, 478 (5th Cir. 1994)—for the proposition that, if the Code limits a trustee's ability to surcharge exempt assets, then § 105(a) does not allow a bankruptcy court to override explicit mandates of other sections of the Bankruptcy Code and surcharge the debtor's exempt assets. (Dkt. No. 48 at 57).

While *Law* is clear that administrative expenses may not be paid pursuant to § 105(a), the effect of *Law* on the issue of whether the Bankruptcy Court can require the damages to the Estate assessed in the Supplemental Sanctions Order to be paid pursuant to § 105(a)—as a consequence of the party's contempt—is less clear. Further, because *Law* was issued after the briefing was completed in this case, and neither party, in the interim, brought its possible impact on this case to the Court's attention, the Court will order the parties to brief this issue in order to resolve it.

In sum, the text of the Compliance Order is premised on the deed transfer of the Anna's Hope Property to the Chapter 7 Estate if the Prossers did not pay the Contempt Fees Order—the $528,086.07 in attorney's fees and costs (*i.e.*, administrative expenses) incurred by the Trustee in litigating the contempt proceedings—in monthly installments. If the Prossers failed to comply with those terms, the Compliance Order directed the Prossers to execute deeds of title concerning the Anna's Hope Property to the Chapter 7 Estate in order to sell the property to recover those fees and expenses. Once the $528,086.07 was paid, the Trustee could use any remaining funds from the sale to pay the amounts due on the Supplemental Sanctions Order. The Rule 70 Order, which permitted the execution and docketing of the deeds, was premised on the failure of the Prossers to comply with the Compliance Order (which was, in turn, premised on the Contempt Fees Order).

Thus, both the Compliance Order and Rule 70 Order authorized the deed transfer and sale of the Property to pay the Contempt Fees Order first, and then the Supplemental Sanctions Order with any remaining monies.

As discussed above, the Court has found that the Anna's Hope Property cannot be conveyed and sold to pay the Contempt Fees Order. Accordingly, the Court will reverse in part the Compliance Order and the Rule 70 Order to the extent that they require the conveyance to the Chapter 7 Estate and sale of the Anna's Hope Property for payment of the Trustee's administrative expenses (attorney's fees and expenses). However, the Court will order further briefing on the issue of whether the exempt Anna's Hope Property may be conveyed to the Chapter 7 Estate and sold to pay the Supplemental Sanctions Order as a consequence of the Prossers being found in contempt of court.

Because the matter concerning the sale of the Anna's Hope Property is not completely resolved, the stay imposed by this Court on the sale of the property will remain in place pending further Order of the Court.

## IV.    CONCLUSION

Based on the foregoing, the Court finds that the Bankruptcy Court had jurisdiction to enter the Preliminary Injunction Order; that the Bankruptcy Court did not abuse its discretion in entering the Contempt Order; that there was no error of law or fact in the Bankruptcy Court's entry of the Supplemental Sanctions Order directing the Prossers to pay the Chapter 7 Trustee $419,135.59 on account of the damaged and missing wine; and that there was no error of law or fact in the Bankruptcy Court's entry of the Contempt Fees Order directing the Prossers to pay the Trustee $528,086.07, representing the fees and expenses incurred in the filing, investigation, and litigation of the Motion to Enforce Turnover Order, for Contempt and for Sanctions.

The Court will reverse in part the Compliance Order and the Rule 70 Order because they

are both premised on the deed transfer and sale of the exempt Anna's Hope Property to pay the Chapter 7 Trustee's administrative expenses, which is not allowed by 11 U.S.C. § 522(k). The Court will order further briefing by the parties on the issue of whether the Anna's Hope Property may be conveyed to the Chapter 7 Estate and sold to pay the Supplemental Sanctions Order under the authority provided by § 105(a) as a consequence of the Prossers being found in contempt of court.

The Court will continue the stay imposed by the Court's November 15, 2013 Order (13-cv-0087, Dkt. No. 29) until further Order of this Court.

An appropriate Order accompanies this Memorandum Opinion.

Date: February 23, 2017                    _____/s/_____
                                           WILMA A. LEWIS
                                           Chief Judge